**In re DOLLAR THRIFTY
SHAREHOLDER
LITIGATION.**

**Cons. C.A. No. 5458–VCS.**

Court of Chancery of Delaware.

Submitted: Aug. 27, 2010.
Decided: Sept. 8, 2010.

Jay W. Eisenhofer, Esquire, Michael J. Barry, Esquire, Stephen G. Grygiel, Esquire, Grant & Eisenhofer P.A., Wilmington, Delaware; Joel Friedlander, Esquire, Sean M. Brennecke, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Mark Lebovitch, Esquire, Amy Miller, Esquire, Jeremy Friedman, Esquire, Bernstein Litowitz Berger & Grossman LLP, New York, New York; Marc A. Topaz, Esquire, Lee D. Rudy, Esquire, Michael C. Wagner, Esquire, James H. Miller, Esquire, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, Pennsylvania; Darren J. Robbins, Esquire, Randall J. Baron, Esquire, David T. Wissbroecker, Esquire, Robbins Geller Rudman & Dowd LLP, San Diego, California; Joseph H. Weiss, Mark D. Smilow, Esquire, Weiss & Lurie, New York, New York; Harwood Feffer LLP, New York, New York; Glancy Binkow & Goldberg LLP, Los Angeles, California; Carmella P. Keener, Esquire, Jessica Zeldin, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Counsel for Plaintiffs.

Donald J. Wolfe, Jr., Esquire, Matthew E. Fischer, Esquire, Dawn M. Jones, Esquire, Meghan M. Dougherty, Esquire, William E. Green, Jr., Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Mitchell A. Lowenthal, Esquire, Deborah Buell, Esquire, Cleary Gottlieb Steen & Hamilton LLP, New York, New York, Attorneys for Defen-

dants Scott L. Thompson, Thomas P. Capo, Maryann N. Keller, Edward C. Lumley, Richard W. Neu, John C. Pope, and Dollar Thrifty Automotive Group, Inc.

Raymond J. DiCamillo, Esquire, Kevin M. Gallagher, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware; Joseph P. Moodhe, Esquire, Gary W. Kubek, Esquire, Courtney M. Dankworth, Esquire, Debevoise & Plimpton LLP, New York, New York, Attorneys for Defendants Hertz Global Holdings Inc. and HDTMS, Inc.

## MEMORANDUM OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

The plaintiffs seek a preliminary injunction preventing the consummation of a merger under a merger agreement under which Hertz Global Holdings, Inc.[1] will buy all the shares of its smaller rental car industry rival Dollar Thrifty Automotive Group, Inc. for $32.80 per share in cash (including a $200 million special dividend that will only be paid in the event of the merger) and 0.6366 shares of Hertz stock for each share of Dollar Thrifty stock (the "Merger," and the "Merger Agreement" respectively). The Merger consideration was worth $41 per share as of signing. The plaintiffs criticize the Dollar Thrifty board (the "Board") for failing to conduct a pre-signing auction and for signing up a Merger Agreement that yielded only a modest premium over the closing price of Dollar Thrifty's stock on the last trading day before the Merger Agreement was signed. Even worse, the plaintiffs say, the Merger Agreement included a termination fee and matching rights that the plaintiffs believe have a quelling effect on any topping bidder. The plaintiffs say this even

though another large industry player, Avis Budget Group, Inc., has come forward with a bid that nominally tops the Hertz bid, by offering a combination of cash and stock equal to $46.50 per share. In formulating that bid, Avis was able to receive confidential, non-public information from Dollar Thrifty and has had many months to put together its financing and other terms. At this point, the Dollar Thrifty Board has already determined that Avis's bid would be superior to Hertz's if it could be assured that Avis would actually close. But Avis, unlike Hertz, has refused to promise to pay *any* reverse termination fee in the event that antitrust approval for an Avis–Dollar Thrifty merger cannot be attained and has also not matched the level of divestitures Hertz is willing to make to achieve antitrust approval.

A vote is scheduled on September 16, 2010 for the Dollar Thrifty stockholders to decide whether to accept the Hertz deal. At this point, the only thing apparently standing between Avis and a deal with Dollar Thrifty is its willingness to address Dollar Thrifty's concern over closing certainty by offering to pay a reverse termination fee that compensates Dollar Thrifty for the risk of non-consummation. The deal protections in the Merger Agreement have not prevented Avis from presenting a competing bid, and the termination fee represents a very small percentage cost to Avis of its topping bid. Indeed, the termination fee does not constitute a material impediment for any topping bidder who wishes to make a materially superior offer to Hertz's, it at best deters fractional topping. In that sense, the deal protections actually encourage an interloper to dig deep and to put on the table a clearly better offer rather than to emerge with pennies more.

---

[1]. For purposes of effecting the proposed Merger, Hertz created a subsidiary HDTMS, Inc. I will refer to both Hertz Global and its merger subsidiary collectively as "Hertz."

On the record before me, I must deny the plaintiffs' motion. Despite the plaintiffs' skillful advocacy, the record after factual discovery does not support their claim that the Dollar Thrifty Board likely breached its fiduciary duty to take reasonable steps to maximize the value Dollar Thrifty stockholders would receive. Rather, the record reveals that the Dollar Thrifty Board, and its CEO Scott Thompson, has managed Dollar Thrifty successfully through a financial crisis that saw the company on the brink of insolvency and improved its performance to the point where the company was profitable and receiving plaudits from the stock market. The Board did so by economizing on costs and engaging in profitable arbitrage in handling the company's rental car fleet. Throughout the last several years, while managing the company, the Board has been open to selling the company if a deal favorable to the stockholders could be achieved. To that end, the Board engaged in lengthy discussions with both Hertz and Avis in the last several years. Each of Hertz and Avis ultimately walked away, in circumstances when they could have bought the company at a bargain price.

By the end of 2009 when Hertz again approached Dollar Thrifty, Dollar Thrifty's performance had stabilized and its stock price had risen sharply, from under $1 per share in March 2009, up to $26.97 on December 22, 2009. Despite having misgivings about again discussing a sale with an industry rival that had failed to come through before, the Board took a deep breath, exhaled, and determined that it had to listen to Hertz. After achieving assurances from Hertz that it would offer a price in the mid-thirties, a substantial premium to the prevailing market price and as important to the Board, a good price in terms of the company's fundamental earnings potential, the Board decided to engage in negotiations with Hertz, while simultaneously focusing on managing the business. The Board expressly considered whether to reach out to Avis and other possible buyers. But the Board concluded that Avis was not well positioned financially to make a bid given its own leverage position and the state of the credit markets and due to the somewhat greater antitrust risk the Board's advisors believed a deal with Avis presented. The Board also took into account the strong possibility that Hertz would go away if the company went into auction mode, a possibility buttressed by Hertz's demonstrated willingness to take a pass on Dollar Thrifty at lower price levels and its demand for exclusivity. Equally important, the Board was worried that a failed public auction could damage the company, including by distracting and creating anxiety among company employees, who had been through difficulty in recent years involving downsizing and increased expectations for personal productivity.

The Board therefore decided to engage solely with Hertz but reserving for itself the opportunity in any merger agreement to consider a post-signing topping bid. After months of difficult negotiations during which Dollar Thrifty shut down talks in order to extract better terms, Hertz and Dollar Thrifty had narrowed their differences. Near the end of this process, Avis's CEO made an awkward and oblique overture to Thompson, asking him to go to dinner through a banker. The Avis CEO never said what he wanted, and gave off signals that made it possible that he wanted to talk about employing Thompson at Avis. This feeble inquiry came at a very sensitive time in the final stages of the Hertz negotiations.

Using Hertz's desire to announce a deal before its own tepid earnings release and Dollar Thrifty's expected strong earnings release as leverage, Dollar Thrifty got

Hertz to improve its offer to $41 per share, comprised mostly of cash but also of Hertz stock. Critically, Dollar Thrifty also got Hertz to agree to divest assets generating up to $335 million in revenue if necessary to achieve antitrust approval, and to pay a reverse termination fee of $44.6 million if antitrust approval was not achieved. In exchange, Dollar Thrifty agreed that it would pay an identical termination fee [2] but only if it signed up a higher valued deal within a year.

By the time these terms were reached, Dollar Thrifty's stock price had continued to increase, and the $41 per share constituted a relatively modest 5.5% premium to market. But it represented a price near the top range of the discounted cash flow valuations presented to the Board. Moreover, the Dollar Thrifty Board, while pleased that the company's position had improved, realized that the company did not have a strong long-term growth story and thought that it would be useful to lock in a price when the company was being fully valued. Most importantly, the Board also considered that signing up a deal with Hertz would provide Avis with a strong incentive to either put up or shut up, because the Dollar Thrifty stockholders would likely approve the sale to Hertz if Avis did not act and Avis risked, by not acting, forever losing the chance to buy one of the last remaining smaller players in the rental car space.

In concluding that this approach to value maximization was reasonable, I give credit to the record that shows that the entire Dollar Thrifty Board had no conflict of interest that gave them a motive to do other than the right thing. The record reveals no preference on the part of the Board for Hertz over Avis or any other acquirer. The CEO, Thompson, has a huge incentive not to sell at a suboptimal price because he has a large chunk of actual common stock and has no apparent desire to work for an industry competitor. When directors who are well motivated, have displayed no entrenchment motivation over several years, and who diligently involve themselves in the deal process choose a course of action, this court should be reluctant to second-guess their actions as unreasonable.

Based on the circumstances the Board confronted, I cannot find that its course of action was unreasonable. To wish to sell in sight of the top of the market and to not be driven solely by the market premium is a reasonable determination to make when a company's stock has run up sharply during the period of negotiations and when the company's internal estimates of its own earnings potential suggest the deal price is highly favorable. To do so in a manner that provides, as the Board has done, a fair opportunity for a topping bid and that actually creates a powerful incentive for another industry rival to finally act with definitiveness rather than coyness, cannot also be deemed unreasonable. In fact, on this record, it appears that the Board's determination to sign up a deal with Hertz is what actually kicked Avis into mature action. Avis did not even own a share of Dollar Thrifty before the Hertz Merger Agreement was signed and, consistent with the Board's concerns about Avis's financial capacity and ability to secure regulatory approval, took three months to secure financing to make a bid, and has yet to offer a reverse termination fee to deal with antitrust risk.

By its actions, the Board gave the stockholders the chance to take a floor price that was very attractive in light of the Board's estimate of the company's fundamental value, left them uncoerced to turn

---

2. Dollar Thrifty would also be required to pay     up to $5 million to Hertz for expenses.

down the deal if they preferred to remain independent because the termination fee is only payable if a higher value deal is accepted, and left the door open to a higher bidder. Although I have no doubt that other reasonable approaches could have been taken, the approach the Dollar Thrifty Board took here emerges, on this record, as a reasonable one and that is what is necessary to satisfy its duties.

At this stage, this court has no basis to intervene. The plaintiffs do not seriously challenge the Dollar Thrifty Board's refusal to accept a topping bid from Avis that does not include a reverse termination fee or some other adequate closing assurance. Value is not value if it is not ultimately paid. Avis is free to make an economic move and to have its bid accepted without unreasonable impediment by the Hertz Merger Agreement. The Dollar Thrifty stockholders are free to accept or reject the Hertz deal on their own. In other words, the free play of economic forces and the reward-risk calculus of the Dollar Thrifty stockholders should determine the outcome without the injection of the uncertainty of an injunction against board action that seems to have had the effect of ginning up competition for Dollar Thrifty between two highly-motivated industry rivals.

## II. Factual Background

As is required in considering a motion for a preliminary injunction, these are the facts that I conclude are likely to be found, based on the current record, after a trial in this matter.[3]

### A. The Dollar Thrifty Board

The Board consists of six members, five of whom are independent. The only non-independent director is Scott Thompson, the CEO. Three of the other directors, John C. Pope, Edward C. Lumley and Thomas P. Capo (who has served as Chairman since 2003) have been on the Board since 1997, the year the company went public. The other two members, Maryann N. Keller and Richard W. Neu joined the Board in 2000 and 2004 respectively. All of the directors are experienced in the automotive industry,[4] and none of them other than Thompson[5] will receive any compensation other than as stockholders as a result of the Merger.[6]

### B. Dollar Thrifty And The Other Major Players In The Rental Car Industry

Since 1997, Dollar Thrifty has been a publicly traded company. It is currently the fourth-largest rental car company in the United States. The U.S. rental car market has relatively few players. In 2009, four companies—Enterprise Holdings, Inc., Avis, Hertz and Dollar Thrifty—accounted for over 90% of the industry's total revenue.[7] Dollar Thrifty had 7.1% of the total market and 11.8% of the on-

---

3. *E.g., Tate & Lyle PLC v. Staley Continental Inc.,* 1988 WL 46064, *reprinted in* 14 DEL. J. CORP. L. at 429–430 (Del.Ch.1988).

4. *See* Def. Ans. Br.App. A (detailing the industry experience of all the members of the Board).

5. Thompson will receive approximately $22.5 million in compensation stemming from the proposed merger. *See* DX–1 (Hertz S–4) at 150.

6. *See* DX–1 at 146–50. Because part of the consideration for the Merger will be Hertz stock, the Dollar Thrifty Board bargained to have a member of the Dollar Thrifty Board join the Hertz board after the Merger to protect the interests of the Dollar Thrifty stockholders. The companies settled on Capo as the Dollar Thrifty Board member who will be joining the Hertz board after the Merger. *See* PX–31 (Thompson) at 79.

7. DX–3 at HPR00000106.

airport market.[8] Both Dollar Thrifty and Avis's Budget brand focus on value-conscious, leisure travelers. Hertz, on the other hand, focuses mainly on weekday business travelers and only recently entered the leisure market with its purchase of Advantage Rent A Car.[9]

## C. *In 2007 And 2008 Dollar Thrifty Has Numerous Discussions With Both Hertz And Avis About A Merger*

The 2007 acquisition of Vanguard Car Rental[10] by Enterprise ignited discussions between the other major players in the industry about strategic combinations.[11] In April 2007, Dollar Thrifty and Hertz began talks regarding a potential business combination. The two companies entered into a confidentiality agreement and conducted initial due diligence. Members of the two companies' senior management met to consider a possible transaction but shortly after the meeting the companies terminated their discussions.[12]

In October 2007, Dollar Thrifty received a non-binding indication of interest from Avis about a possible combination at a price of $44 per share with a 58% cash, 42% stock consideration mix. In December 2007, Avis lowered its offer to $35.50 at a time when Dollar Thrifty's stock was trading at $24.12 per share.[13] In what would become a common refrain, Dollar Thrifty expressed a willingness to consider the offer but warned Avis that deal certainty was of "paramount importance."[14] Avis would not agree to Dollar Thrifty's

demands for a reverse termination fee payable in the event that antitrust approval was not received and in January 2008, the two companies mutually agreed to terminate discussions.[15]

Three months later, in March 2008, Gary Paxton, the then President and CEO of Dollar Thrifty, contacted Mark Frissora, the CEO of Hertz, and Ronald Nelson, the CEO of Avis, to see if either would be interested in re-engaging in discussions about a merger.[16] As a result of this overture, both Hertz and Avis indicated that they would be interested in such a transaction.

In April and May 2008, Dollar Thrifty again signed confidentiality agreements and began conducting due diligence with both Avis and Hertz. As a result, Dollar Thrifty received non-binding indications of interest from both companies in late May. Dollar Thrifty continued negotiations with both Avis and Hertz and in early June went so far as to provide both companies with a draft Agreement and Plan of Merger prepared by its outside counsel, Cleary Gottlieb Steen & Hamilton, LLP. Shortly thereafter, however, Avis advised Dollar Thrifty that it was no longer interested in pursuing a merger.[17] When Avis walked away, Dollar Thrifty's shares were trading in the range of $10–15. In August 2008, Hertz also informed Dollar Thrifty that it was not interested in pursuing a transaction at that time.

8. *Id.*

9. *See* PX–13 (Neu) at 129; *In re Dollar Thrifty S'holder Litig.*, C.A. No. 5458–VCS at 92–94 (Del. Ch. Aug. 25, 2010) (TRANSCRIPT).

10. Vanguard was the owner of the Alamo and National car rental brands.

11. *See* DX–1 at 91.

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.* at 93.

### D. *Dollar Thrifty's Turnaround*

In May 2008, Thompson had joined Dollar Thrifty as CFO. At that time, Dollar Thrifty's share price had tumbled to $13 from almost $50 less than a year earlier. Thompson served as CFO for about five months before being promoted to CEO in October 2008. By then, Dollar Thrifty was in dire straits. Its stock price had fallen below $1 per share and it was on the brink of defaulting on about $1.5 billion of debt.

Under Thompson's leadership, Dollar Thrifty has performed a skillful economic u-turn. Thompson attributes this success to numerous factors, but three stand out.

First, Thompson renegotiated the purchase agreement that Dollar Thrifty had with Chrysler. Before going public in 1997, Dollar Thrifty was owned by Chrysler and a vestige of that relationship was a supply agreement that required Dollar Thrifty to purchase over 100,000 cars per year from Chrysler, and ensured that 75% of all the cars Dollar Thrifty purchased every year came from Chrysler.[18] The 75% requirement hampered Dollar Thrifty's efforts to negotiate with other car manufacturers.[19] Thompson took advantage of Chrysler's own economic difficulties in early 2009 to eliminate the 75% requirement and dramatically lower the number of cars that Dollar Thrifty had to purchase from Chrysler.

Second, Thompson changed the way that Dollar Thrifty purchased cars from manufacturers so that Dollar Thrifty had more investment exposure to the used-car market.[20] This meant that instead of being guaranteed a residual resale price on the cars it purchased, Dollar Thrifty would be exposed to the downside risk of the used-car market, but also would be in a position to take advantage if the market improved. Dollar Thrifty's fleet of cars went from being about 60% "risky" to about 95%.[21] This move proved profitable. In late 2009, used cars began a period of material price growth.[22] The strong used-car market for 2009 and 2010 caused Dollar Thrifty's cost per car in its fleet to decrease from $336 in 2009[23] to $245–255 in 2010.[24] Importantly, Dollar Thrifty expects the cost per car to rebound back to $300–310 in 2011.[25] Dollar Thrifty's advisors estimate that the $194 million 2010 corporate EBITDA projection from July 2010 includes $54 million attributable to unsustainable reductions in fleet cost associated with the booming used-car market.[26]

Third, Thompson embarked on a series of cost-cutting and productivity enhancing endeavors as soon as he was appointed CEO. Thompson slashed Dollar Thrifty's workforce across all levels. The company laid off 40% of its executive vice-presidents, 30% of its officers, and 10–15% of its workforce.[27] Dollar Thrifty also eliminated all executive perks. Knowing that these cuts would rattle the remaining workforce and knowing that the prior merger talks had caused employee unrest, Thompson tried to encourage the remaining workers to concentrate on their jobs. Thus, he made the deep cuts rapidly and in one fell swoop, reasoning that "if every-

---

18. PX–31 (Thompson) at 31–32.

19. *Id.* at 33.

20. *Id.* at 24.

21. PX–31 (Thompson) at 24.

22. PX–50 (Buster) at 170–72.

23. DX–8 at DTG00000164.

24. DX–15 (Dollar Thrifty Form 10–Q).

25. *Id.*

26. Pinsky Decl. ¶ 19.

27. PX–31 (Thompson) at 23.

body will go once and go deep, I'll only go this one time." [28]  To encourage the remaining employees to feel secure and thus better concentrate on the task at hand, Thompson first announced that the company was not for sale. Then, to partly make up for the anxiety and increased demands on the remaining workforce, he switched the company to a casual dress code. More tangibly, Thompson got the Board to set aside a large piece of the company's equity—approximately 10%—to be used for stock options that the company could give to the officers and executives to ensure that he got "their hearts, their minds and all their efforts." [29]

### E.  With Thompson As CEO, Dollar Thrifty And Hertz Again Engage In Fruitless Talks

Shortly after Thompson became CEO in October 2008, Frissora contacted him to discuss the possibility of reviving talks between Hertz and Dollar Thrifty. The Board instructed management to recommence talks and over the next four months the two companies haggled over the terms of a potential merger. During this period, Dollar Thrifty's stock was anemic and Hertz made offers of $3.50 per share in January and again in February when Dollar Thrifty's shares were trading at $0.88.[30] Thompson became convinced that "we can't let anyone buy [Dollar Thrifty] on the cheap or risk derailing the teams [sic] attitude," and communicated this to the Board.[31]  After seeing the team at Dollar Thrifty work, Thompson told the Board

that "I am all for merging but only merge on our terms. We have a valuable company in a consolidating industry." [32]  Heeding Thompson's advice, on March 23, the Dollar Thrifty Board decided that given the condition of the financial markets it was in the best interest of the company to focus on everyday operations and not on a merger that would be difficult to accomplish.[33]

### F.  Dollar Thrifty And Hertz Resume Negotiations And Begin Discussions Leading To The Merger

On December 4, 2009, Frissora again reached out to Thompson about a possible merger between Dollar Thrifty and Hertz. The Board was apprehensive about reopening negotiations with Hertz in light of the failed talks in the past,[34] but on December 7, Thompson communicated to Frissora that the Board was open to new merger talks, and on December 10, 2009, the two companies entered into a new confidentiality agreement.[35]

#### 1.  A Not–So–Brief Pause To Dilate On The Board's Choice Of Strategic Advisors

Although ultimately not an issue I conclude is meritorious, the plaintiffs make extended arguments about the propriety of Dollar Thrifty's decision to use not just JP Morgan, its pre-existing financial advisor, but also Goldman Sachs to advise it during the merger negotiations with Hertz.

**28.**  *Id.*

**29.**  *Id.* at 88–89.

**30.**  *Id.* at 94.

**31.**  DX–7 (Email from Thompson to the Board).

**32.**  *Id.*

**33.**  SPX–6 (March 23, 2009 Dollar Thrifty Board Meeting Minutes).

**34.**  *See e.g.,* PX–1 (Capo) at 35 ("The general sense was ... here we go again, wasting corporate time and resources, and is it really likely to lead to any transaction or not?").

**35.**  DX–1 at 95.

The plaintiffs say that the retention of Goldman Sachs tainted the sales process. The plaintiffs attempt to paint a picture in which Goldman Sachs was hired by Thompson to repay a personal debt, at which point Goldman Sachs came up with the idea that Dollar Thrifty and Hertz should merge, and then rammed the transaction through the Dollar Thrifty Board on behalf of the private equity firm Clayton Dubilier and Rice ("CD & R") that owns a large part of Hertz—a private equity firm that the plaintiffs contend is more important to Goldman Sachs as a client than Dollar Thrifty. This picture, however, does not emerge with color from the record.

The plaintiffs' argument rests partially on the premise that Goldman Sachs was conflicted because CD & R was "chock full" of former Goldman Sachs employees.[36] As evidence of the graveness of Goldman Sachs's conflict, the plaintiffs point to an internal JP Morgan email chain between David Fox, a vice-chairman at JP Morgan and Mark Pinsky, JP Morgan's lead banker for Dollar Thrifty, in which Fox suggests that Pinsky tell Thompson "that Goldman is in bed with CD & R and you can bet they have a Hertz conflict."[37]

Several vital things about this email chain are glossed over, if not wholly ignored, in the plaintiffs' briefing. First, it should be noted that the emails do not concern the Dollar Thrifty/Hertz Merger at all, but rather relate to an equity offering that Dollar Thrifty was contemplating in September 2009. Next, the plaintiffs' contention later in their brief that JP Morgan also had a business relationship with CD & R (along with JP Morgan's own recognition of this in the emails),[38] is evidence of one of the facts of business life—that most of the top, if not all, banks have relationships with the major private equity firms, like CD & R.[39]

The email chain is best viewed as one bank trying to make sure its competitor doesn't steal its client. JP Morgan viewed Goldman Sachs as an interloper trying to angle into JP Morgan's deal.

The plaintiffs also suggest that Thompson hired Goldman Sachs out of an impermissible sense of personal obligation and failed to inform the Board about his true motivations and relationship with Goldman Sachs or Goldman Sachs's relationship with Hertz and CD & R. This argument also falls flat. The Board was well aware that Thompson had engaged Goldman Sachs on behalf of Dollar Thrifty months before Hertz and Dollar Thrifty even began their latest round of merger talks. This, again, is related to the fact that the emails the plaintiffs rely on to prove Goldman Sachs's conflict relate to an equity offering that Goldman Sachs assisted Dollar Thrifty with in September 2009. In conjunction with that deal, the minutes of the Board meetings on August 26, 2009[40] and September 23, 2009[41] both reflect that the Board knew Goldman Sachs was involved in helping Dollar Thrifty manage-

**36.** Pl. Op. Br. at 25.

**37.** PX–18.

**38.** *See also Id.* (Mark Pinsky of JP Morgan admonishing his colleague Fox that JP Morgan had a similar relationship with CD & R as Goldman Sachs).

**39.** PX–4 (Jacob) at 29 (answering that Goldman Sachs had a relationship with CD & R but that Goldman Sachs "has relationships with many leveraged buyout firms, many corporates [sic], many pension funds, many institutional investors.").

**40.** SPX–11.

**41.** SPX–12.

ment assess the transaction.[42] Further, in conjunction with the Board's decision to retain Goldman Sachs for the equity offering, Thompson advised the Board about Goldman Sachs's relationship with Hertz, and that Goldman Sachs performed and cleared internal conflict checks before both the equity offering and the Merger engagement.[43]

The plaintiffs again rely on the testimony of a JP Morgan employee to establish that Thompson's allegiance to Goldman Sachs was somehow impermissibly personal.[44] Although William Jacob of Goldman Sachs did testify that he perceived Thompson to be "loyal to Goldman Sachs," that is because Goldman Sachs worked on the Group 1 Automotive, Inc. IPO when Thompson was CFO of that company and Thompson was impressed with how they had handled the deal.[45] The banker at Goldman Sachs who Thompson had personally worked with on the Group 1 deal, however, was no longer a Goldman Sachs employee.[46] Thompson was put in touch with Jacob by the analyst who covered Group 1, and Jacob and Thompson had never met before Thompson contacted him about working on the September equity deal.[47]

The plaintiffs next point to an email chain between Thompson and Jacob about fees in which Thompsons says "I need to get you [Goldman Sachs] even with [JP Morgan] without drama."[48] Again, the plaintiffs' characterization of the email chain is overstated and the quoted language is better understood in the proper context. Thompson begins the email chain by telling Jacob that they needed to clarify the fee arrangement because Thompson's notes "are not perfectly clear."[49] Jacob responds by saying that the plan was originally to have Goldman Sachs's fee worked out to be the same as JP Morgan's but that it became complicated to write the agreement that way. Goldman Sachs and Dollar Thrifty, therefore, agreed that Goldman Sachs would be paid $5 million, as opposed to JP Morgan's $7 million, but that Dollar Thrifty could pay Goldman Sachs an additional $2 million in its sole discretion if Dollar Thrifty felt it was merited.[50] Thompson's unsolicited response that he wanted to get Goldman Sachs the $2 million might not have been proper, in the sense that he should have wished to pay each advisor only the minimum amount necessary to get them to perform well, but it is understandable if he valued the work Goldman Sachs was doing and felt that they deserved equal treatment with JP Morgan.

**42.** SPX–11 at DTG00025199 (August 26, 2009 Dollar Thrifty Board Meeting Minutes) ("Mr. Thompson advised that he had met with representatives of both Goldman Sachs and JPMorgan...."); SPX–12 at DTG00083354 (September 23, 2009 Dollar Thrifty Board Meeting Minutes) ("Following such discussions, and based on the recommendations of Goldman Sachs and JPMorgan ... the Board authorized management to finalize the preliminary requirements for an equity offering....").

**43.** Thompson Aff. ¶ 6–8.

**44.** *See* Pl. Op. Br. at 28 (quoting various portions of Pinsky's deposition to show that

Thompson "would not have a job if not for [Goldman Sachs]" and that "[Thompson] has a tremendous amount of personal loyalty to the Goldman banker.").

**45.** Thompson Aff. ¶ 5.

**46.** *Id.*

**47.** *Id.*

**48.** PX–7 at GS—DT 00011227; Pl. Op. Br. at 30.

**49.** PX–7 at GS—DT 00011228.

**50.** *Id.*

### 2. *Hertz Expresses Interest At $30 Per Share*

On December 22, 2009, Hertz made a formal expression of interest to acquire Dollar Thrifty at a price of $30 per share at a mix of 50% cash and 50% stock.[51] Eight days later, on December 30, 2009, the Board met to consider Hertz's offer.[52] At this meeting, Thompson advised the Board that one of the main concerns with a transaction with Hertz was "certainty of closing due to many factors, including regulatory review."[53] Antitrust counsel from Cleary Gottlieb advised the Board on the regulatory issues and the Board asked questions of the lawyer.[54] The Board was then advised by a different Cleary Gottlieb lawyer about its fiduciary obligations in connection with the offer, including in particular its *Revlon* duties.[55]

After this portion of the meeting, the bankers from JP Morgan and Goldman Sachs joined in to present materials to the Board about the economics of Hertz's offer. JP Morgan and Goldman Sachs offered a preliminary DCF analysis of the company which produced a valuation in the $28.80–$33.60 range.[56] The bankers also noted that the $30 offer price represented an 11.4% premium over the December 28, 2009 closing price of $26.93, was a 35.5% premium to Dollar Thrifty's 30–day volume weighted average price ("VWAP") and a 40.4% premium to Dollar Thrifty's 90–day VWAP.

Importantly, the Board considered at the meeting whether to contact Avis and decided against it.[57] The Board talked about the fact that Hertz had a less substantial leisure market presence than Avis so a transaction with Hertz would likely present less antitrust risk.[58] The Board also discussed the fact that Avis would have trouble financing the deal because of its bank covenants and the state of the financial markets[59] and "at the outset, [the Board] was very adamant that [it] wanted certainty of transaction close as one of the critical criteria...."[60]

The next day, Dollar Thrifty responded to Hertz, rejecting its offer but leaving open the possibility for further negotiations. Dollar Thrifty expressed a desire for a price "at least in the mid-thirties,"[61] expressed its preference for an all-cash offer,[62] and conveyed that deal certainty was an important issue to the Board.[63] In fact, in his December 31 letter to Frissora, Thompson stated that Dollar Thrifty "will require as a condition to proceeding with further discussions, confirmation that Hertz will bear the burden of any and all conditions imposed by any regulatory agency...."[64]

---

**51.** DX–18. The Dollar Thrifty stock was trading at $26.97 at the time.

**52.** DX–14 (December 30, 2009 Dollar Thrifty Board Meeting Minutes).

**53.** *Id.*

**54.** *Id.*

**55.** *Id.*

**56.** DX–20 at DTG00001998.

**57.** PX–1 (Capo) at 118–20; PX–13 (Neu) at 106–07.

**58.** PX–1 (Capo) at 118–19.

**59.** *Id.* at 119.

**60.** *Id.* at 119–20.

**61.** DX–1 at 97; DX–21.

**62.** *Id.*

**63.** *Id.*

**64.** DX–21.

### 3. Hertz Raises Its Offer To $35 And Dollar Thrifty Accedes To Hertz's Demand For An Exclusivity Agreement

On January 7, 2010 Dollar Thrifty's and Hertz's financial advisors met to discuss the financial aspects of a possible deal.[65] On January 18, senior management from the two companies met,[66] and on January 25, Hertz submitted a revised offer to Dollar Thrifty.[67]

The January 25 offer increased the price to $35 a share and changed the consideration mix to 60% cash and 40% stock.[68] Hertz responded to Dollar Thrifty's antitrust concerns by offering that it was "prepared to use [its] reasonable best efforts to obtain regulatory clearance ... including, if necessary, divesting assets...."[69]

On January 27, the Dollar Thrifty Board met to consider Hertz's latest offer. The bankers again presented materials relating to the economics of the transaction.[70] The $35 price represented a premium of 44.5% to the January 25 stock price of $24.22, a 30.6% premium to the 30–day VWAP and a 62.3% premium to the 90–day VWAP.[71] The bankers also indicated that Hertz had signaled a willingness to divest between $100–150 million in assets to achieve regulatory approval.[72] The Board again engaged in discussions about whether to reach out to Avis, and Avis's comparative ability to Hertz's to actually close a deal.[73] The Board, for instance, discussed that because of Avis's financial condition, the consideration in an offer from Avis would need to be largely in Avis stock which would trigger provisions of the New York Stock Exchange Rules and require an Avis shareholder vote and that there was somewhat greater antitrust risk in an Avis deal.[74]

After these deliberations, the Board chose not to accept Hertz's offer but authorized Thompson to execute a 45–day exclusivity agreement with Hertz and requested that management update the Board at least every two weeks on the progress of talks.[75] On February 3, Dollar Thrifty and Hertz entered into an exclusivity agreement that expired at the end of March 17, 2010.[76] On February 10 and 11, the senior management of Dollar Thrifty and Hertz met in person in Chicago to hash out a deal. On February 12, Thompson updated the Board via email that Hertz appeared serious about getting a deal done but that there was "no news on the anti trust [sic] front."[77]

Also on February 12, Cleary Gottlieb delivered a draft merger agreement to De-

---

65. DX–1 at 97.

66. *Id.*

67. DX–23.

68. *Id.* It was also in this offer that the idea of structuring the transaction to include a dividend payment as part of the consideration was first included. Apparently the two companies had discussed the option during their January 18 meeting.

69. *Id.*

70. DX–25.

71. *Id.* at DTG00000065.

72. *Id.* at DTG00000061.

73. DX–1 at 98; SPX–16 (January 27, 2010 Dollar Thrifty Board Meeting Minutes) (reflecting that the Board had a lengthy discussion about the "relative certainty of deal closing.").

74. PX–31 (Thompson) at 192–93; Thompson Aff. ¶ 9 (stating that the Board was advised on multiple occasions about the antitrust risk of mergers with Avis and Hertz); PX–13 (Neu) at 126–28.

75. DX–24.

76. PX–36.

77. DX–27.

bevoise & Plimpton LLP, Hertz's legal counsel. On the 24th, Debevoise sent Dollar Thrifty its revisions to the agreement.[78] The revisions were not well received. Thompson felt that the proposed revisions were not only inconsistent with his discussion with Frissora, but "inconsistent with what I believed would be a public company transaction, kind of way off the mark."[79] The draft agreement proffered by Hertz now contained numerous additional closing conditions, but did not contain any reverse termination fee, and contained a 4.5% termination fee payable by Dollar Thrifty if Dollar Thrifty signed up a different deal instead within a year.[80] On March 5, the Board met to discuss the proposed agreement. At that meeting the advisors outlined the problems with the agreement and the Board decided to close the data room and instructed Thompson to reach out to Hertz to "re-emphasize the minimum risk allocation requirements of [Dollar Thrifty]."[81]

On March 12, Hertz submitted another draft merger agreement aimed at addressing some of Dollar Thrifty's concerns.[82] In apparent recognition of the importance of the antitrust issue to Dollar Thrifty, Hertz included along with the proposed agreement, a memorandum providing more detail on what it perceived would be its obligations under the agreement with regards to antitrust approval.[83] The next day,

Thompson emailed the Board relaying that a new draft merger agreement had been received and that the "way over the top" parts had been taken out.[84] Thompson warned that the agreement was still not acceptable but that in management's opinion it was "worth discussing."[85] Additionally, Thompson told the Board that Dollar Thrifty's data room would remain closed until after the March 24 board meeting.

On March 17, Cleary Gottlieb sent a revised merger agreement to Hertz that included a termination fee binding Dollar Thrifty of 3%[86] and a reverse termination fee binding Hertz of 5%.[87] Three days later, on March 20, Debevoise responded for Hertz with yet another draft merger agreement that removed more of the closing requirements Dollar Thrifty had found objectionable.[88] This time, foregoing any attempts to pencil-in termination fee numbers, Debevoise instead marked the termination fee and reverse termination fee percentages as "under discussion."[89] The next day, Thompson emailed the Board to report that the deal was "moving forward," but that price was going to be a "[b]ig issue" because Dollar Thrifty was "hitting the ball and [Hertz is] going to report another shortfall."[90]

### 4. The March 24 And 25 Dollar Thrifty Board Meeting

With the Hertz exclusivity agreement expired, and a viable offer to consider, the

78. DX–30.

79. PX 31 (Thompson) at 133.

80. DX–30 (Draft Merger Agreement) § 8.02; DX–31 (highlighting the problematic provisions of the proposed agreement).

81. DX–32 (March 5, 2010 Dollar Thrifty Board Meeting Minutes).

82. DX–35.

83. *Id.* at DTG00037028.

84. DX–36.

85. *Id.*

86. DX–39 at DTG00038381.

87. *Id.* at DTG00038382.

88. DX–42 at DTG00000094.

89. DX–40 at DTG00038906–07.

90. DX–41.

Dollar Thrifty Board met on March 24 and 25 in Dallas, Texas to discuss how best to move forward. The second day of the meeting was devoted to analyzing the status of the deal with Hertz. Cleary Gottlieb again explained the Board's fiduciary duties in connection with a possible sale of the company.[91] Cleary Gottlieb specifically addressed the "manner in which [the risk of] non-consummation of a transaction should be considered as part of any Revlon analysis."[92] JP Morgan and Goldman Sachs were then called upon to review the current state of the economics of the transaction. The bankers presented updated DCF calculations that valued Dollar Thrifty at between $29.70 and $38.40 per share. By the time of the meeting, the $35 price, which had been offered over two months earlier, represented a 5.9% premium to Dollar Thrifty's March 19 closing price of $33.04, a 13.7% premium to the 30–day VWAP, and a 23.9% premium to the 90–day VWAP.

The Board also again considered the possibility of making an overture to Avis now that Dollar Thrifty was no longer constrained by the exclusivity agreement.[93] Thompson was concerned that trying to create an auction instead of dealing with Hertz alone posed real risks that no deal would get done with either potential buyer.[94] JP Morgan and Goldman Sachs both expressed serious doubt that Avis could secure the necessary financing for a cash bid given the state of the credit markets and Avis's current leverage profile, and Cleary Gottlieb chimed in to discuss the need for Avis to obtain a shareholder vote if it was to use more equity-based consideration.[95] This sparked a conversation about what sort of deal protections Dollar Thrifty would need to work into any deal with Avis to guard against the uncertainty created by these shortcomings.[96]

The Board, however, was worried that a merger agreement with Hertz could chill a topping bid from Avis. In fact, Pope asked Cleary Gottlieb to address just this question and discuss what effect an agreement with Hertz would have on Avis's ability to make a bid for Dollar Thrifty.[97] Other members of the Board were also concerned about leaving the door open for Avis, Capo felt the best strategy was to "get a fair deal with Hertz" but "at all times leav[e] ourselves, within the contract, the ability to evaluate any superior offer that may come in."[98]

Finally, at the meeting, the Board's independent directors met alone for almost an hour.[99] During this meeting, the independent directors discussed the need to be

91. SPX–20 (March 24–25, 2010 Dollar Thrifty Board Meeting Minutes).

92. *Id.*

93. *Id.;* PX–1 (Capo) at 120–121 (stating that "as we moved through the process we were always asking the question, 'Is there anybody else out there?' ").

94. PX–15 (Pinsky) at 119.

95. *Id.;* PX–29 (Pope) at 166 (recalling that there had been discussions at the meeting about the "do-ability" of a transaction with Avis, and that the financial advisors had indicated that Avis's financial situation was "a little bit more challenging."); PX–31 (Thompson) at 205–06 (stating that one factor the Board considered at the meeting when deciding not to contact Avis was potential financing issues, and recalling that the discussions were oral as opposed to being part of an official presentation).

96. SPX–20.

97. *Id.*

98. PX–1 (Capo) at 121.

99. SPX–20. The independent directors made a point of talking without management at every board meeting. PX–29 (Pope) at 160.

on the lookout for any risk that management might be "starting to favor one thing versus another, or management falling in love with the transaction or one of those things." [100]

Ultimately, the Board decided that negotiations with Hertz should continue, that no outreach to Avis should be made, and authorized Thompson to reopen the data room and to contact Hertz so that the companies could continue due diligence and resume negotiations. The next day, Thompson reached out to Frissora, who was pleased and said he would get his people moving forward. [101] Thompson again made clear that deal certainty remained important to Dollar Thrifty. [102]

### 5. Negotiations Between Hertz And Dollar Thrifty Break Down After Dollar Thrifty Pushes For $45

On April 8, 2010, Dollar Thrifty proposed that Hertz pay a price of $44.96 per share with 50% cash, 50% stock consideration mix. [103] The price represented a 25% premium to Dollar Thrifty's closing price on that day of $35.97. Hertz replied to the offer by shutting down its data room the next day and stopping due diligence. [104] At the same time, Frissora attempted to set up a phone call with Thompson, but Thompson explained via email that "regrettably" his calendar would not allow him to talk until the week of April 26. [105] Frissora responded that the $45 proposal was so far off the mark that Hertz was shutting down the process until Frissora and Thompson could come up with "some sort of a gap closure plan to see if this transaction still has legs." [106]

On April 12, Frissora sent Thompson a letter communicating the results of a Hertz board meeting held that morning. [107] Frissora stated that Hertz was still interested in acquiring Dollar Thrifty, but given what Hertz perceived as the material difference in valuation expectations between the two companies, that the Hertz board had decided to "step back from the transaction." [108]

Thompson reacted to the letter by emailing Pinsky, Jacob and Capo (among others) and suggesting that the proper response was "no response hard dark and just drive on. Advisors and lawyers stand down. Have a quickie board meeting this week for a formal close of the loop." [109] Thompson next contacted Vicki Vaniman, Dollar Thrifty's general counsel, to have her set up a Dollar Thrifty board meeting the topic of which would be "termination of special project." [110] Critically, Thompson's initial email to the bankers and Capo ended with the statement: "[w]e will close a deal with next [Hertz] CEO or [Avis]." [111] In other words, two weeks before the signing of the Merger Agreement that the plaintiffs claim was rigged from the get-go, the record suggests that the Hertz transaction was dead, and that Dollar Thrifty's CEO was happy to continue as an indepen-

100. PX–29 (Pope) at 160–61.

101. DX–43.

102. DX–44.

103. DX–1 at 101; PX–31 (Thompson) at 144.

104. DX–45.

105. DX–46.

106. Id.

107. DX–48.

108. Id.

109. DX–50.

110. DX–49.

111. DX–50.

dent company and negotiate somewhere down the road with Hertz *or* Avis.

A Dollar Thrifty board meeting was scheduled for April 16. That Board meeting, however, never happened. Instead, Thompson and Frissora met on April 16 at the suggestion of JP Morgan to see if something could be worked out.[112] At the April 16 meeting, Dollar Thrifty expressed willingness to do a deal with a price above $40 per share. Hertz countered with an offer of $38 per share, and the negotiations again broke down.[113]

### G.  *Avis's Purported Attempt To Make An Overture*

Very late in the negotiations with Hertz, Avis came back on the scene. It did so in a very oblique, awkward, and unclear manner. As far as I can tell, on April 12, Avis's CEO Nelson contacted Rob Sivitilli, an investment banker at JP Morgan, who was not working on the Dollar Thrifty deal to ask if Thompson would speak with Nelson.[114] I say as far as I can tell because Avis chose not to litigate and offered up its general counsel Michael Tucker and not Nelson as its Rule 30(b)(6) witness in response to the plaintiffs' subpoena.[115] Tucker had only become general counsel at Avis on April 19, 2010 and had no personal knowledge of any of these events. Instead, Tucker gave his deposition testimony based on what others at Avis, particularly the CEO Nelson, had told him about these events. Nelson never gave a deposition or submitted an affidavit under oath.

His liege Tucker, fumbled all over the subject of whether Sivitilli called Nelson or Nelson called Sivitilli.[116] In the end, Tucker says that Nelson contacted Sivitilli. That makes sense because Sivitilli was not even on the JP Morgan deal team advising Dollar Thrifty.

In any event, it appears Thompson never spoke with Sivitilli. In fact, there is no evidence that Sivitilli had any relationship or any contact with anyone at Dollar Thrifty. Presumably, Nelson chose to reach out through Sivitilli because of a preexisting banking relationship between Avis and JP Morgan, and Nelson's own relationship with Sivitilli. Nelson's request, therefore was not passed directly from Sivitilli to Thompson, but routed through Dollar Thrifty's bankers at JP Morgan who asked Thompson if he would accept Nelson's call. Thompson thought it was strange that Nelson would call someone to ask permission to call him, but said he would be happy to speak with Nelson.[117] Thompson asked JP Morgan what the call was about and was told that Nelson had been asking a lot of questions about him personally.[118] Thompson asked Dollar Thrifty's JP Morgan bankers to clarify,

---

112.  DX–1 at 101.

113.  *Id.;* PX–1 (Thompson) at 144 (suggesting that there were two breakdowns, the one after the $45 dollar proposal and the one after this meeting); DX–61 (April 16, 2010 Email from Pinsky to Fox and others) (stating that it "[l]ooks like deal is dead for now").

114.  DX–1; PX–38; PX–31 (Thompson) at 207; PX–38 (Tucker).

115.  Court of Chancery Rule 30(b)(6) allows corporations to provide a witness to be deposed on their behalf as to designated matters.

116.  PX–38 (Tucker). Tucker first responded to the question of who called who: "I don't know." *Id.* at 15. He then later testified that after "giving it further thought" that it was "Mr. Sivitilli that contacted Ron Nelson." *Id.* at 30–31. Finally, Tucker changed his mind again and decided that it was Nelson who had contacted Sivitilli. *Id.* at 42–43.

117.  PX–31 (Thompson) at 207.

118.  *Id.*

"[a]bout the company or me?" to which the banker replied "[y]ou."[119] An internal JP Morgan email confirms that some of the bankers there did in fact perceive that the call was related to Thompson personally. On April 16, Fox states in an email to others at JP Morgan that "Ron Nelson called me today. I did not take his call. Can someone send me [Thompson's] career history. How he was recruited, etc."[120]

Meanwhile, also on April 16, Sivitilli continued his role as middleman and responded via email to Nelson telling him that the "[s]hort answer is that your counterpart is very willing to re-engage."[121] It is hard to make sense of Sivitilli's use of the term "re-engage," and there is no record evidence of Nelson's response, if any. As noted, Sivitilli never spoke directly to Thompson but was only conveying the answer his JP Morgan colleagues had received from Thompson, and Thompson is clear in his testimony that before this latest outreach he "had not heard from [Nelson] since the day I became CEO, via letter, via e-mail or phone call."[122]

By contrast, the plaintiffs claim that Nelson had previously called Thompson in January of 2009. This contention, however, is not supported by the testimony of anyone who had any personal knowledge of those events. Again, Nelson was not deposed and Tucker had no personal knowledge of the alleged January 2009 phone call. Tucker's hearsay assertion that "at some point in time, in January of 2009, [Nelson] placed a call to [Thompson] to see if Dollar Thrifty was interested in discussing the potential for a transaction,"[123] is the only "evidence" in the record that contradicts Thompson. Tellingly, Tucker did not know what, if anything, Thompson said in response, but did recall that "there was nothing done at that time as a result of that conversation."[124] In other words, Tucker's testimony does not establish that Nelson's attempt to contact Thompson in January 2009 was even successful in the sense that Nelson and Thompson actually spoke with each other at that time.

Even if it is to believed, and even if it were somehow admissible against the defendants,[125] Tucker's hearsay testimony about the January 2009 phone call from Nelson to Thompson would illustrate the fact that Nelson was capable of calling Thompson himself. Thompson also commented on this in his deposition, stating that it was "strange[ ] that he called to ask someone if he could call me."[126] It is very hard to understand why Nelson, who had supposedly demonstrated his ability to call Thompson directly and out of the blue in the past, would on this occasion route the request through a banker.

All that said, it is clear that on April 19, Nelson and Thompson spoke and that they scheduled a dinner meeting for April 28 in Tulsa. But, the plaintiffs' characterization of the planned meeting as being "to discuss a transaction"[127] is not supported by the record. Tucker, who was again giving

119. *Id.*

120. DX–61.

121. PX–38 at ABG00001.

122. PX–31 (Thompson) at 201.

123. PX–37 (Tucker) at 46.

124. *Id.*

125. The plaintiffs have made no showing of how this hearsay is admissible against the defendants. Avis is clearly not the plaintiffs' party-opponent, quite the opposite.

126. PX–31 (Thompson) at 207.

127. Pl. Op. Br. at 2.

hearsay testimony, testified that he did not know anything about what was said during that conversation except that Nelson and Thompson agreed to have dinner on the 28th.[128] Thompson, who was on the call, denies that Nelson indicated any subject he wished to discuss at dinner: "[Nelson] said he was going to bring [Bob Salerno, his second in command] with him. I said, 'Who would it be appropriate for me to bring?' He said, 'I don't know. We're just going to talk....'"[129] I find Thompson's testimony that Nelson did not say why he wanted to meet credible. That said, Thompson did admit despite Nelson's failure to name the subject he wished to discuss, that he initially thought the meeting might have been about a merger.[130] But, Thompson ultimately decided that the meeting was about himself personally and not a merger after questioning his investment bankers and being told that they had heard nothing about any possible Avis interest.[131] Therefore, Thompson had ultimately "concluded that the dinner had nothing to do with merger activity because nothing had got picked up anywhere."[132]

H. *Hertz Offers $40 Per Share, Dollar Thrifty Pushes Them To $41 And The Companies Agree On A Plan Of Merger*

Meanwhile, on April 21, 2010 Frissora called Thompson to relay a new offer from Hertz. The terms of that offer were as follows: a price of $40 per share, with an 80% cash, 20% stock consideration mix; termination and reverse termination fees of 3.5% each; and an antitrust divestiture threshold set at the Advantage brand and/or other assets generating $100 million in revenue.[133] Frissora conditioned his new offer on execution of a definitive merger agreement before Hertz announced its quarterly results on Monday, April 26.[134] Frissora was eager to get the deal signed so that Hertz could announce the agreement along with its earnings. Dollar Thrifty's advisors were suspicious that Hertz wanted to use the deal to cover up what would be an otherwise disappointing earnings announcement, but eventually concluded that Frissora's eagerness was attributable to a normal desire to announce the deal in conjunction with an earnings release.[135]

The Board met on April 22, the day after Frissora communicated Hertz's new offer, to discuss how to proceed. The financial advisors again presented about the economics of the proposal. This time, the $40 per share offer constituted a 7.5% premium over the previous day's closing price of $37.22, a 15.9% premium over the 30–day VWAP and a 29.2% premium over the 90–day VWAP. The advisors also presented a new DCF analysis which estimated the value of Dollar Thrifty to be between $29.20 and $43.00 per share. This analysis took into account Dollar Thrifty's expected positive first quarter results.[136]

Next, the Board, with the help of its advisors, discussed whether Hertz would

128. PX–37 (Tucker) at 50.

129. PX–31 (Thompson) at 208.

130. *Id.* at 211.

131. *Id.*

132. *Id.*

133. DX–51.

134. *Id.*

135. PX–4 (Jacob) at 191–98.

136. DX–52 (stating that the DCF analysis assumes a valuation date of June 30, 2010); PX–15 (Pinsky) at 291–92 ("[w]hen we did a discounted cash flow analysis it would have incorporated [Dollar Thrifty's] first quarter earnings as well as [Dollar Thrifty's] future best guess....").

actually walk away from a deal if Dollar Thrifty did not agree to the condition that the deal be concluded before the Monday earnings announcements and decided that Hertz would, but that the deal was still worth doing.[137]

The Board was also advised by its financial advisors that Hertz was unlikely to go higher than its $40 offer.[138] The financial advisors estimated that there was a better than 50/50 chance that Hertz would walk away at a price of $42, and that if the deal didn't close in this period Hertz would "probably go[ ] away for an 'extended period.' "[139] Similarly, the advisors suggested that if Dollar Thrifty went for an extra dollar it would be difficult to get Hertz to agree to other contract provisions, which, as previously discussed, were important to Dollar Thrifty.[140]

The Board decided that the time was right to sell and directed its legal advisors to finalize a merger agreement by April 25. Thompson took advantage of Frissora's desire to do a deal before Hertz's earnings release by using the intervening days to negotiate the price to $41 per share and secure an additional $75 million

in antitrust divestiture commitments from Hertz.[141]

On April 25, the Board met to consider the final agreement. The Board again received guidance as to its fiduciary duties from Cleary Gottlieb.[142] It again received presentations from its financial advisors in which JP Morgan and Goldman Sachs both separately advised the Board that the transaction price was fair to shareholders.[143] Similarly, Cleary Gottlieb again spoke with the Board about antitrust risk and Hertz's related commitments in the Merger Agreement. Finally, the Board again focused on making sure that Avis would not be precluded from making an offer because of the agreement with Hertz.[144]

On April 25, Hertz and Dollar Thrifty executed the Merger Agreement.

## I. *The Terms Of The Merger Agreement*

The Merger Agreement provides for a price of $41 per share to be paid in an 80% cash and 20% Hertz stock consideration mix. Included in the consideration is a

---

137. PX–1 (Capo) at 103 (commenting that the Board was presented with a transaction that had a timing requirement and that "the sense of the board, and based on advice of our advisors, was had we rejected it, there would be no offer," that the offer was "take it or leave it"); PX–31 (Thompson) at 171 ("Ultimately, [Frissora] did become very eager to get a transaction done very fast, to have something for his earnings announcement, and ultimately when we look at the totality of the transaction, we determined that it was appropriate and in our shareholder's [sic] best interest to sign and execute the agreement under the timeline that Hertz gave us.").

138. PX–29 (Pope) at 192 ("[The Board] had advice from our bankers that [Hertz] really were near [its] end on the deal and, for instance, that $40 was as far as [Hertz] would go, not a penny more, and these were terms

they must have and so, almost a 'Take it or leave it'.").

139. DX–19 (Handwritten notes of Capo from April 22, 2010 Dollar Thrifty Board Meeting).

140. DX–19.

141. DX–54; DX–55.

142. SPX–22.

143. *Id.*

144. PX–1 (Capo) at 104 ("We had an opportunity within the agreement to entertain any competing bids and we thought the $41 was fair and so we went ahead and approved the transaction."); PX–29 (Pope) at 165 ("[T]here was no risk, in our opinion, that somebody— if they wanted to come in, couldn't come in after having signed a deal.").

$200 million special cash dividend [145] to be paid by Dollar Thrifty to its shareholders immediately before closing and only if the Merger was consummated.[146]

The Merger Agreement provides for a $44.6 million termination and reverse termination fee, with an additional reimbursement of up to $5 million in expenses if the termination fee is paid.[147] It contains a commitment from Hertz to make divestures of the Advantage line of business plus assets generating an additional $175 million in revenue if necessary to obtain antitrust approval.[148] Additionally, the Merger Agreement contains a "no-shop" provision, preventing Dollar Thrifty from affirmatively soliciting higher bids. But the Merger Agreement also contained a fiduciary out and provided Dollar Thrifty with relatively wide leeway to share confidential information with another bidder if the bidder has made a proposal that the Board determines is reasonably likely to lead to a superior offer than Hertz's.[149] Before Dollar Thrifty accepted a superior proposal and terminated the Merger Agreement with Hertz, Hertz was given the chance to match.[150] These matching rights were not limited to one match. That said, if an interloper outbid Hertz, Dollar Thrifty could take the higher deal.

### J. Avis Reacts Quickly To The Merger Announcement And Makes A Bid

After the Merger Agreement was executed, Thompson canceled his dinner with Nelson, which was scheduled to happen just three days later, because he felt it would be inappropriate to meet with Avis so soon after signing an agreement with Hertz.[151] If, as Thompson had reason to suspect, Avis wished to talk to him about a possible role with Avis, dinner was problematic. Also, given the no-shop provision of the Merger Agreement, Thompson could not directly or indirectly "solicit, initiate, knowingly facilitate or knowingly encourage" Avis to make a proposal.[152]

On May 3, 2010, Nelson sent Thompson and Capo a letter expressing his surprise at the announcement of the Merger between Hertz and Dollar Thrifty and announcing Avis's intention to make a "substantially higher offer to acquire Dollar Thrifty."[153] Nelson also stated that he was confused by the transaction because Avis had "on several occasions in the past expressed interest in entering into a transaction with Dollar Thrifty."[154] Nelson then references his conversation with "[Dollar Thrifty's] financial advisor" in April, saying that he had reiterated to JP Morgan Avis's interest in a transaction and attempted to arrange a meeting with Dollar Thrifty.[155] As discussed at length earlier, the true nature of his earlier contacts is far from clear, and Nelson's lucidity of expression in his May 3 public letter seems remarkably different from his earlier mumblings.

145. DX–56 (Merger Agreement) § 6.14.

146. The parties disagree on the proper treatment of this dividend for purposes of calculating the termination fee percentages and the premium that the $41 price represents. I will address this in greater detail below.

147. DX–56 § 8.02(a)(i), (c).

148. Id. § 6.03(c).

149. Id. § 5.03(b).

150. Id. § 5.03(d).

151. PX–31 (Thompson) at 226–27.

152. DX–56 § 5.03(a).

153. PX–61.

154. Id.

155. Id.

Regardless of the extent of Avis's previous interest in a transaction with Dollar Thrifty, the May 3 letter made clear that Avis was now interested. In response, the Dollar Thrifty Board convened via teleconference that same day.[156] At the meeting, Cleary Gottlieb informed the Board about Avis's letter, and together with the financial advisors discussed the requirements for a "superior proposal" under the Merger Agreement with Hertz, whether Avis would be capable of making such a proposal, and the Board's *Revlon* duties in this context.[157] The Board then discussed the likelihood that Avis could make a superior proposal, the antitrust risk with Avis, and Avis's ability to complete a transaction.

The Board unanimously decided that Avis's proposal could "reasonably be expected to result in a 'superior proposal.'"[158] Cleary Gottlieb was instructed to draw up the notice to Hertz, and Avis would be notified that they could begin conducting due diligence after signing a confidentiality agreement.

Avis and Dollar Thrifty signed a confidentiality agreement the next day, and Avis began conducting due diligence.[159] Almost three months after the May 3 letter, Avis finally made an offer to acquire Dollar Thrifty on July 28, 2010 at a price of $46.50 per share.[160] The consideration would be $39.25 in cash (including the same $200 million special dividend in the Hertz deal) and 0.6543 shares of Avis stock for each share of Dollar Thrifty. In order to make the offer, Avis had to receive

consents from its lenders.[161] Avis's offer contained: a commitment to divest assets generating up to $325 million in revenue to obtain antitrust approval; no financing contingency; no termination fee or reverse termination fee; and no matching rights.[162]

On August 3, in a formal letter, Thompson communicated to Nelson that the Board could not declare Avis's offer "superior" to Hertz's but gave Avis a guide to how to cure the deficiency.[163] Thompson pointed to the fact that in order to be considered superior the Avis deal must be "reasonably expected to be consummated on a timely basis," and that given the lack of a reverse termination fee and lingering antitrust concerns, the Board was unable to establish that Avis's offer would meet this requirement.[164] Any sophisticated party in Avis's position would, as a result of that communication, know what it had to do to be deemed the winner.

## K. *The Filing Of This Lawsuit*

The class action complaint in this lawsuit was filed on May 5, 2010—after Avis's letter reacting to the Hertz Merger Agreement, but long before Avis's July 28 bid or the Dollar Thrifty Board's refusal to declare the bid superior. The allegations in the complaint, therefore, focus on the conduct of the Board in negotiating the transaction with Hertz. Specifically, Count I of the complaint alleges that the Board breached its fiduciary duties by agreeing to the Merger Agreement with Hertz and Count II alleges that Hertz aided and

---

**156.** DX–58 (May 3, 2010 Dollar Thrifty Board Meeting Minutes).

**157.** *Id.*

**158.** *Id.*

**159.** Avis admitted that Dollar Thrifty was cooperative in the due diligence process. *See* PX–37 (Tucker) 55–56.

**160.** DX–66.

**161.** *Id.*

**162.** DX–67.

**163.** DX–9.

**164.** *Id.*

abetted that breach. On July 6, the plaintiffs filed their consolidated class action complaint, armed with the fruits of discovery but again alleging only that the Board breached its duties with regard to its negotiation of the Hertz transaction, not with regard to its refusal of Avis's July 28 proposal (which still had not yet been made). In arguing this motion on August 25, the plaintiffs concentrated their fire solely on the Board's decision to sign the Merger Agreement without a pre-signing market check. Avis, as noted, has failed to join the lawsuit, and is content to joust publicly with Dollar Thrifty about whether its proposal is superior.

I now address the merits of this motion for preliminary injunction.

### III. *Legal Analysis*

#### A. *Procedural Standard*

■ The plaintiffs seek to preliminarily enjoin the Merger's consummation. In order to succeed in that effort, they must demonstrate: (1) a reasonable probability of success on the merits; (2) that they will suffer irreparable injury if an injunction does not issue; and (3) that the balance of the equities favors the issuance of an injunction.[165]

### B. *The Merits*

#### 1. *Overview Of The Revlon Obligations Of The Board*

■ When the Dollar Thrifty Board decided to enter into a transaction that involved the sale of the company in a change of control transaction, it was charged with the obligation to secure the best value reasonably attainable for its shareholders, and to direct its fiduciary duties to that end.[166] As is well known, *Revlon* does not require that a board, in determining the value-maximizing transaction, follow any specific plan or roadmap in meeting its duty to take reasonable steps to secure—i.e., actually attain—the best immediate value.[167] Instead, *Revlon* commands that directors, consistent with their traditional fiduciary duties, act reasonably, "by undertaking a sound process to get the best deal available." [168] Indeed, the question posed by a board's action (or inaction) in a sales context is "whether the directors made a reasonable decision, not a perfect decision." [169] Thus, although the level of judicial scrutiny under *Revlon* is more exacting than the deferential rationality standard applicable to run-of-the-mill decisions governed by the business judgment rule, at bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as

165. *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del.1986).

166. *E.g., Revlon*, 506 A.2d at 184 n. 16 ("The directors' role remains an active one, changed only in the respect that they are charged with the duty of selling the company at the highest price attainable for the stockholders' benefit."); *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del.1994) ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end.").

167. *E.g., Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del.1989) ("[T]here is no single blueprint that a board must follow to fulfill its duties."); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 192 (Del.Ch. 2007) ("[*Revlon* ] does not, of course, require every board to follow a judicially prescribed checklist of sales activities.").

168. *Netsmart*, 924 A.2d at 192 (Del.Ch.2007) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del.1994)).

169. *QVC*, 637 A.2d at 45 (Del.1994).

they choose a reasonable route to get there.[170] Specifically, this form of enhanced judicial scrutiny involves two "key features":

(a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and

(b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing. The directors have the burden of proving that they were adequately informed and acted reasonably.[171]

### 2. Summary Of The Plaintiffs' Arguments

The plaintiffs' central argument is easy to understand. They say that by failing to take affirmative steps to draw Avis into a bidding contest with Hertz *before* signing up a definitive merger agreement with Hertz, the Dollar Thrifty directors breached their duty to take a reasonable approach to immediate value maximization, as required by *Revlon*. In support of this argument, the plaintiffs contend that the Board should not have been easily cowed by the fear that Hertz would walk away from sale discussions for two reasons: i) Dollar Thrifty was one of, if not the last, roll up opportunity in the rental car industry and the prospect of Avis getting it might have made Hertz more, not less, willing to bid and bid higher; and ii) Dollar Thrifty's stock price had risen precipitously and therefore the premium to market that a deal with Hertz would secure had narrowed, lessening any cost to losing the bird in hand.

Even more certainly, say the plaintiffs, when Avis's CEO made his awkward overtures for a dinner date with Thompson very late in the process with Hertz, this should have suggested to the Board that Avis was seriously interested and caused the Board to try to secure a bid from Avis before signing with Hertz. At the very least, the plaintiffs say that Thompson should have accelerated his planned dinner with Nelson and at least heard what he had to say. To make matters worse, the Dollar Thrifty Board larded the Merger Agreement with bid-deterring deal protections that were overly strong in comparison to the light premium Hertz was paying. Although the plaintiffs do not challenge the motivations of the Board itself, the plaintiffs do suggest that the Board's financial advisors, Goldman Sachs and JP Morgan, had a strong financial incentive for deal certainty that was different from the Dollar Thrifty stockholders, because these advisors would not receive the bulk of their compensation unless a deal was consummated and were not entitled to a higher fee if they produced a deal with a higher value.

### 3. Preliminary Observations On The Plaintiffs' Arguments

In addressing these arguments, I begin with an important concession. I have no doubt that the strategy of value maximization that the plaintiffs now advocate was one that a properly motivated board could have reasonably chosen to adopt. When Hertz approached Dollar Thrifty in late 2009, the Dollar Thrifty Board could have chosen to attempt to engage Avis and to stimulate a pre-signing auction between these industry rivals. The Dollar Thrifty

---

170. Despite the linguistic similarity between the terms rationality and reasonableness, reasonableness review "is more searching than rationality review, and there is less tolerance for slack by the directors." *Netsmart*, 924 A.2d at 192.

171. *QVC*, 637 A.2d at 45.

Board could have reasoned that this was the best way to get the best price in a firm deal, on the premise that each of these fierce rivals would be impelled by the loss of Dollar Thrifty to the other to dig as deep as they could to pay a winning price. In adopting such an approach, the Dollar Thrifty Board could have taken into account that each had expressed interest in a purchase in the past, albeit interest that never manifested itself in either case in a firm bid. The Dollar Thrifty Board could have also viewed itself as better able to take this approach because its own financial position and operating performance had improved and the company was, at least for the foreseeable future, on a sound footing. Because Hertz and Avis would have had their own reasons to be discreet, the Board could have reasoned that the price-increasing utility of trying to stimulate a heated auction was worth the risk of a leak that would possibly again roil an employee base that had been through downsizing and tumult. Put simply, I do not quibble with the notion that the plaintiffs' perspective is one that loyal fiduciaries reasonably seeking to obtain a value-maximizing deal could have adopted. But that, of course, is not the question.

The question is whether the alternative approach that the Dollar Thrifty Board adopted was itself a reasonable choice that a loyal and careful board could adopt in the circumstances.[172] I frame that question with purpose. The heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts are, in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders.[173] Most traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders.[174] Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decisionmaking and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground.[175]

172. *QVC*, 637 A.2d at 43–45; *see also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 115 (Del.Ch.2007) ("The duty to act reasonably is just that, a duty to take a reasonable course of action under the circumstances presented.").

173. *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 781 (Del.Ch.1988) (arguing that *Revlon* is best viewed as a duty of loyalty case); *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *14 (Del.Ch. Aug. 8, 1988) (observing that *Revlon* is "essentially a breach of loyalty case in which the board was not seen as acting in the good faith pursuit of the shareholders' interests.") (citing *In Re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770 (Del.Ch.1988)).

174. The *Revlon* case itself arguably involved both of these motivations, as Revlon's CEO Michel C. Bergerac appears to have preferred to continue running Revlon but when it was

clear that a sale would occur, wished to avoid selling to Ron Perelman, a person the Supreme Court found that Bergerac disdained. *Revlon*, 506 A.2d at 176 (noting Mr. Bergerac's "strong personal antipathy to Mr. Perelman.").

175. *E.g.*, Stephen M. Bainbridge, *Unocal at 20: Director Primacy in Corporate Takeovers*, 31 DEL. J. CORP. L. 769, 795–96 (2006) (arguing that the Delaware Supreme Court recognized the difficulties associated with choosing either the entire fairness or business judgment rule standard to govern takeover disputes and so created a middle ground with *Unocal* and *Revlon*); Ronald J. Gilson, *Unocal Fifteen Years Later (And What We Can Do About It)*, 26 DEL. J. CORP. L. 491, 496 (2001) ("In Unocal, the Delaware Supreme Court chose the middle ground that had been championed by no one. The court unveiled

In that middle ground, the reviewing court has leeway to examine the reasonableness of the board's actions under a standard that is more stringent than business judgment review and yet less severe than the entire fairness standard.[176] Moreover, the defendants themselves are allocated the burden to show that they acted reasonably.[177]

One of the benefits of this approach is that it mandates that the court look closely at the motivations of the board. In adopting a reasonableness, rather than rationality, standard, *Revlon* and *Unocal* implicitly acknowledge that there is a predicate question that must be answered that is not typically at issue in a case governed by the business judgment rule. In a business judgment rule case, the rule applies because the board is disinterested and thus has no apparent motive to do anything other than act in the best interests of the corporation and its stockholders.[178] In that context, the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives.[179]

In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board to block a bid or to steer a deal to one bidder rather than another.[180] Through this examination, the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective, and to thereby smoke out mere pretextual justifications for improperly motivated deci-

an intermediate standard of review, somewhere between the duty of care and the duty of loyalty.").

**176.** *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1277–78 (Del.1989) ("On the surface, it may appear that the trial court [in a sale of corporate control context] has been applying an ordinary business judgment rule analysis. However, on closer scrutiny, it seems that there has been a *de facto* application of the *enhanced* business judgment rule under *Unocal.* To the extent that this has caused confusion, we think it is more a matter of semantics than of substance.... When *Revlon* duties devolve upon directors, this Court will continue to exact an enhanced judicial scrutiny at the threshold, as in *Unocal,* before the normal presumptions of the business judgment rule will apply.") (emphasis added); *Golden Cycle, LLC v. Allan,* 1998 WL 892631, at *11 (Del.Ch. Dec. 10, 1998) (describing the business judgment review as the most deferential to directors, the entire fairness review as the "most stringent," and the *Revlon/Unocal* review as existing between the two).

**177.** *QVC,* 637 A.2d at 45 ("The directors have the burden of proving that they were ade- quately informed and acted reasonably."); *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985) (burden on directors to show reasonableness); *In re Pennaco Energy, Inc.* 787 A.2d 691, 705 (Del.Ch.2001) (quoting *QVC,* 637 A.2d at 45) (same).

**178.** *E.g., Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971); *Trenwick America Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 194 (Del.Ch.2006); *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051–54 (Del.Ch. 1996); *In re J.P. Stevens & Co., Inc. S'holders Litig.,* 542 A.2d at 780.

**179.** *Sinclair Oil Corp.,* 280 A.2d at 721 ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose.").

**180.** *See Unocal,* 493 A.2d at 954 ("Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its share- holders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judg- ment rule may be conferred.").

sions.[181] In this sense, the reasonableness standard requires the court to consider for itself whether the board is truly well motivated (i.e., is it acting for the proper

181. The employment of a reasonableness standard to distinguish the type of heightened judicial review required under *Unocal* and *Revlon* from the bare rationality review characteristic of the business judgment rule is a move in some ways analogous to a distinction made in political philosophy. In our law, the business judgment rule insulates the ordinary business decisions of non-conflicted directors so long as those decisions are rational. *E.g., Sinclair Oil Corp.*, 280 A.2d at 721. That is, once the determination has been made that the directors have the proper motivation (i.e., to act in the best interests of the corporation and its stockholders), the court will defer to their decisions so long as those decisions are the product of rational thinking. *Id.; Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53, 64 (Del.1989). In philosophy, despite the definitional similarity between the words reasonable and rational, an analogous separation exists. In the works of John Rawls, rationality refers simply to the ability of a person to use "the powers of judgment and deliberation in seeking ends and interests peculiarly [her] own." JOHN RAWLS, POLITICAL LIBERALISM 50 (Columbia Univ. Press 1993). By contrast, reasonableness has a less selfish connotation, and requires a person to propose and honor fair terms of dealing (or in Rawls's terms, cooperation) with others in society, and to be bound by those terms once assured that others will likewise do so. *Id.* at 49, 51, 54. In other words, to be reasonable, a person's conduct must be fair-minded in reference to its effect on others, whereas, to be rational, conduct simply has to reflect a logical approach to advancing one's own narrow, self-interest. JOHN RAWLS, LECTURES ON THE HISTORY OF POLITICAL PHILOSOPHY 54 (Samuel Freeman ed., Harvard Univ. Press 2008) (2007) ("We tend to use 'reasonable' to mean being fair-minded, judicious and able to see other points of view, and so forth; while 'rational' has more the sense of being logical, or acting for one's own good, or one's interests. In my own work ... the reasonable involves fair terms of cooperation; while the rational involves furthering the good or advantage of oneself, or of each person cooperating.").

In our corporate law, a reasonableness standard is used when there is a basis for concern that directors without a pure self-dealing motive might be influenced by considerations other than the best interests of the corporation and other stockholders. *QVC*, 637 A.2d at 45. By tightening the standard from rationality to reasonableness, this concern is taken into account, by requiring that the directors demonstrate that their decision was well-motivated and was a reasonable way to advance the proper interests they must serve, which are the best interests of the corporation and the stockholders. In this sense, therefore, the *Unocal/Revlon* standards place upon the directors the affirmative burden to show that their decisions were fair-minded in the sense of being a good faith (loyal) and rational (careful and logical) way of advancing the proper contextual objective. This use of a rationality/reasonableness distinction is thus in the same, if more profane, tradition as Rawls. *See* RAWLS, POLITICAL LIBERALISM at 48 n. 1 (tracing the distinction between rationality and reasonableness back to Kant); RAWLS, LECTURES ON THE HISTORY OF POLITICAL PHILOSOPHY at 54–62 (discussing the distinction between these concepts by reference to the work of Hobbes, who attempted to show why it was rational to follow the (reasonable) Laws of Nature he set forth, assuming others were willing to do so). In this very different context of political philosophy, Amartya Sen has said, obviously without any intention of doing so, something that quickly gives a good sense of the distinction between ordinary business judgment rule review and heightened *Unocal/Revlon* scrutiny:

Rationality is in fact a rather permissive discipline, which demands the test of reasoning, but allows reasoned self-scrutiny to take quite different forms, without necessarily imposing any great uniformity of criteria. If rationality were a church, it would be a rather broad church. Indeed, the demands of reasonableness, as characterized by Rawls, tend to be more exacting than the requirements of mere rationality.

The demands of scrutiny would have to be sharpened and tightened when we move from the idea of rationality to that of reasonableness....

AMARTYA SEN, THE IDEA OF JUSTICE 195 (Harvard Univ. Press 2009) (internal footnotes omitted).

ends?) before ultimately determining whether its means were themselves a reasonable way of advancing those ends. As one would expect, when the record reveals no basis to question the board's good faith desire to attain the proper end, the court will be more likely to defer to the board's judgment about the means to get there.

### 4. The Conduct Of The Dollar Thrifty Board

#### a. The Board Was Properly Motivated

Here, the defendants have easily shown that they were properly motivated. The plaintiffs admit that the six person Dollar Thrifty Board has five independent directors. There is also no evidence in the record that the only non-independent director, the CEO Thompson, harbored any entrenchment motivation or any particular desire to sell Dollar Thrifty to Hertz. Rather, the record is clear that the entire Board, including Thompson, has displayed a willingness to talk to anyone who made a serious overture about a sale. Moreover, Thompson and the other directors had a motivation to seek the highest price, because they would personally gain from a deal at a high price. Importantly, Thompson and the other directors owned material amounts of stock and thus had a reason, as do others who actually own Dollar Thrifty stock, to worry about the possibility that

Dollar Thrifty's position might again deteriorate.[182] Put simply, they had a personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so.

There is absolutely no hint in the record that the Board preferred to do a deal with Hertz at some lower value if a better deal was actually attainable from Avis or another source. To the contrary, the record is replete with genuine expressions of frustration on the part of the defendants with Hertz and a willingness to shut down negotiations and take tough positions when necessary to extract concessions from Hertz. The record and the interests of the Board give me every reason to conclude that it would have entertained a serious expression of interest from Avis or any other party.

In that regard, it is important to note the distance between this case and *Revlon* itself. Although *Revlon* is often mistakenly referred to as creating a duty to auction,[183] the case involved very different circumstances. In *Revlon*, an unsolicited bidder, Ron Perelman, was aggressively rebuffed by a board dominated by a CEO, Bergerac, bent on preserving his control (or so the Supreme Court decision suggests).[184] Once it was clear that the company could not remain independent, the board found another buyer more to its

---

**182.** The members of the Board owned the following number of shares (including common shares, vested and unvested restricted shares, performance units, and unvested options): Capo—70,150; Thompson—616,316; Pope—73,013; Lumley—45,828; Keller—66,011; Neu—38,351. Def. Ans. Br.App. A.

**183.** *Macmillan,* 559 A.2d at 1288 ("We stated in *Revlon,* and again here, that in a sale of corporate control the responsibility of the directors *is to get the highest value reasonably attainable for the shareholders.* Beyond that, *there are no special and distinct* 'Revlon duties'. Once a finding has been made by a court that the directors have fulfilled their

fundamental duties of care and loyalty ... there is no further judicial inquiry into the matter.") (emphasis added) (internal citations omitted); *In re RJR Nabisco,* 1989 WL 7036, at *20 (rejecting the idea that *Revlon* stands for the proposition that in the context of a sale of the corporation "a fully independent board has a duty, distinct from its omnipresent duty, to act in good faith and with due care, to conduct a fair ... 'auction.' "); *In re Fort Howard Corp.,* 1988 WL 83147, at *14 (same); *In re J.P. Stevens & Co.,* 542 A.2d at 781–82 (same).

**184.** *Revlon,* 506 A.2d at 184.

own taste. Rather than allowing Perelman to participate fairly in a value-maximizing auction, the board signed up a deal with its white knight in the face of Perelman's proclaimed intention to top. In that circumstance, Bergerac's board was in a highly public process already, had decided to sell, and there was no genuine risk of losing any valuable bird in hand because Perelman was deeply committed to buying Revlon and was willing to top the white knight.

In this case, a board that had had patience-testing negotiations with both Hertz and Avis over the past several years, only to see neither tender a realistic firm bid, counted to one hundred, calmed its emotions, and reacted with patience and openness when Hertz returned to again express interest. Rather than rebuff Hertz as a demonstrably unreliable and flighty suitor, the Board decided that its fiduciary duties obligated it to consider Hertz's expression of interest and to see if a deal could be put together that would be valuable for Dollar Thrifty's stockholders. Thus, the Board displayed not an entrenchment motivation but a willingness to sell. In examining some of the decisions about means made by the Board, I will again touch to some extent on its motivations. For now, what is noteworthy is the absence of any colorable basis to question the Board's motivation at any stage of the process. Obviously, well motivated fiduciaries can make mistaken judgments; that comes with any important job involving the exercise of discretionary judgment. But there is no reason to question the Board's desire to do right by the Dollar Thrifty stockholders.

In saying the Board, I intentionally include the CEO Thompson. The mere fact that a director is an officer does not mean that in every situation the officer-director has interests adverse to other stockholders. The plaintiffs themselves laud the operating performance of Thompson as CEO, they just think he made a non-adroit decision about when and how to do a deal. At best, the plaintiffs make sport of Thompson for being enamored with Goldman Sachs and desiring to ensure that it got the same compensation as JP Morgan. I agree with the plaintiffs that Thompson should not have concerned himself in any way with pushing for Goldman Sachs to get higher compensation unless Goldman Sachs was demanding that and it was thought necessary by the Board to accede to its demand *in order to protect Dollar Thrifty*. But the plaintiffs' assertion that Thompson was somehow personally beholden to Goldman Sachs and wished to reward them is not borne out the by record. Rather, it appears that Thompson, from prior experience, had great confidence in Goldman Sachs's ability as an investment bank, wanted to make sure that if Dollar Thrifty went down the negotiations path again that it would be in the best possible position to actually secure and close a good deal, and perceived that JP Morgan, which had advised Dollar Thrifty during the prior period where no deals had emerged, should for that reason be supplemented by Goldman Sachs.

Likewise, although the plaintiffs have fun with the adolescent e-mail traffic that ensued at JP Morgan when it faced having to work with Goldman Sachs, the plaintiffs have not presented any plausible basis for inferring that the Board's financial advisory team somehow quelled a deal with Avis. Indeed, it is the plaintiffs who make the point that Goldman Sachs had important relationships with CD & R, the private equity firm that has effective control of Hertz. But it was JP Morgan who Avis contacted in the spring, and it was JP Morgan who came away with no clear idea of what Avis wanted. Given the competitive relationship between Goldman Sachs and JP Morgan, JP Morgan had every reason, if it believed Avis was serious about making a bid, to advocate attempt-

ing to get Avis in the game. If it could have done so, it would have made itself look good to the client and showed that it, rather than Goldman Sachs, had delivered real deal value. But the record shows that both JP Morgan and Goldman Sachs seriously considered the relative benefits and risks to their client of involving Avis at various key stages in the process and reached the same conclusion, which is that the risks of doing so outweighed the possible benefits. I perceive no basis in this record to find that Goldman Sachs and JP Morgan would not have been delighted to land a better deal for their client, and the ultimate Goldman Sachs fee arrangement, which provided for a possible $2 million discretionary bonus, actually gave it an incentive to secure an excellent outcome. For all these reasons, I find no basis to question the Board's loyalty.

### b. The Board Diligently Attended To Its Duties

Similarly, the *Revlon* standard demands that the court look closely to ensure that the Board was diligently attending to its duties.[185] *Van Gorkom*,[186] after all, was really a *Revlon* case.[187] Here, the record reveals that the Board was closely engaged at all relevant times in making decisions about how to handle the negotiations with Hertz and whether to try to bring Avis into the process. The deposition testimony of the independent directors reflects their deep involvement and their substantial experience in finance and business; each of the directors deposed gave cogent, uncoached testimony reflecting an impressive knowledge of the company, the industry, and the benefits and risks that different approaches entailed.[188] Put simply, it may be that a well-motivated and careful board made an unreasonable judgment about how to maximize value, but that is the stark question that must be answered. The defendants have convinced me that the entire Board was subjectively well motivated and exercised due care. Even in the realm of heightened scrutiny, judicial (law-trained) second guessing of the means chosen by such a (business-experienced) board to maximize value should, one would think, be rare.[189]

With that in mind, I now turn to some of the key decisions of the Dollar Thrifty Board that the plaintiffs challenge.

### 5. The Alleged Flaws In The Board's Decisionmaking Process

#### a. The Board's Decision Not To Seek Other Bidders

The first decision that the plaintiffs challenge is the Board's determination not

185. *Barkan*, 567 A.2d at 1286 ("The need for adequate information is central to the enlightened evaluation of a transaction that a board must make.").

186. *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985).

187. *See e.g., Gagliardi v. TriFoods Int'l, Inc.* 683 A.2d 1049, 1051 n. 4 ("I count [*Van Gorkom*] not as a 'negligence' or due care case involving no loyalty issues, but as an early, and as of its date, not yet fully rationalized, 'Revlon' or 'change of control' case."); Bernard Black & Reiner Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value*, 96 NW. U.L.REV. 521, 522 (2002) ("Van Gorkom should be seen not as a business judgment rule case but as a takeover case that was the harbinger of the then newly emerging Delaware jurisprudence on friendly and hostile takeovers, which included the almost contemporaneous Unocal and Revlon decisions.").

188. *See PX–1 (Capo); PX–13 (Neu); PX–29 (Pope); PX–31 (Thompson).*

189. *QVC*, 637 A.2d at 45 (reasoning that the board of directors is the body best equipped to make judgments about the many business and financial considerations implicated in selecting the best deal and that a board's reasonable decision should not be second guessed by a court).

to seek out other bidders, and in particular Avis, when Hertz made a serious expression of interest very late in 2009. Implicit in this challenge is the plaintiffs' approval of the Board's decision to engage with Hertz. The plaintiffs do not press the point that Dollar Thrifty's performance had turned around so amazingly that it was a powerhouse poised for a period of phenomenal growth as an independent force. Rather, the plaintiffs acknowledge that it was worthwhile for the Board to explore Hertz's expression of interest.

What the plaintiffs question is the Board's decision not to stimulate an immediate auction. The Board's answer to that question is straightforward and buttressed with citations to their actual deliberative process. The Board was genuinely concerned with upsetting their employees and causing a diminution in productivity by going through a public sales process.[190] The Board was not committed to selling in early 2010, and believed that the company had attained a position of relative strength and stability. Thus, the fear with having a process spill out into public was that the company could again come up without a buyer, risk the market viewing it as damaged, and suffer a decline in productivity and a loss of key employees distracted by and anxious over a possible sale. Adding to this fear was Hertz's prior history. Hertz had been given two clear looks at the company and each time had walked away without making a serious binding offer.

In deciding how to proceed, the Board also received advice about Avis and considered its own experience with Avis. In 2007, Avis made an overture at $44 per share, and then dropped that price off a cliff, ultimately resulting in a breakdown of ne-

gotiations. And in 2008, Avis had a clear chance to buy Dollar Thrifty at a much more attractive price in the $15–20 range, but walked away from the opportunity without making a firm bid and without addressing legitimate antitrust concerns.[191] Before proceeding to deal just with Hertz in early 2010, the Board explicitly considered the utility of reaching out to Avis. The Board received advice that Avis was not well positioned to make a cash bid for Dollar Thrifty because it was heavily leveraged already and subject to severe covenants that could only be amended with creditor approval.[192] Given the state of financing markets in early 2010, the Board's advisors believed Avis could not make a bid not conditioned on financing, and was perhaps not financially strong enough to make a bid at all. Likewise, because Avis was more concentrated in the leisure segment of the rental car industry than Hertz, the Board was advised that a deal with Avis was subject to somewhat greater antitrust risk.

The Board also considered whether Hertz, which had been previously skittish, would stick around if Dollar Thrifty brought Avis into the process. In this regard, the plaintiffs reason from Avis's later emergence to posit a risk-free world. But the Board was acting in real time with no omniscient knowledge of the way others would react to various courses of action. It is no small thing for a strategic acquirer to come public about its desire to buy another industry player. Although management-side doctrinal junkies will cry that a board's interest in buying another industry competitor does not mean that the company would be well served by a similar transaction in which it is the sell-

---

**190.** *See e.g.,* PX–31 (Thompson) at 200–01, 212–13.

**191.** DX–1 at 92–93.

**192.** PX–1 (Capo) at 119; DX–20 at 16–17.

er—i.e., that the company is "in play"—the reality is that the announcement of interest in a strategic transaction does signal that some other business strategy rather than the status quo would, in the board's judgment, be optimal. As important, acquisitions, like sales, create the potential for distraction among employees, as the employees of acquirers often face displacement too.

Thus, the Board weighed the risk that Hertz would simply refuse to engage further if Dollar Thrifty attempted to stimulate a pre-signing auction. It concluded that there was a real possibility that Hertz would do as it did before, simply withdraw, if it faced pre-signing competition. This concern was buttressed by Hertz's own expressed desire for exclusivity, a desire that the Board eventually accommodated but only after extracting from Hertz a $5 per share increase in the proposed price and an agreement to divest substantially more assets to obtain antitrust clearance.

As I have already indicated, a reasonable board could have made the judgment that early 2010 was precisely the time to call the question on both Hertz and Avis, and to tell both of them to put their best bid on the table. It may have been that such an overture would have inspired both companies to enter into a heated contest to secure Dollar Thrifty.

But it is also plausible that if Dollar Thrifty had attempted that maneuver, Hertz would have walked away and Avis not have come forward, in which case the company would have no prospect for a deal and no leverage over either.[193] Alternatively, Hertz might have stayed around and Avis dropped out early, in which case Hertz might have perceived that it did not have to worry much about Avis and did not have to give better terms. Lastly, Hertz might have dropped out, and Avis stayed in, but with no fear that it was in a bidding war with Hertz and no incentive to move forward diligently to offer good terms and real closing certainty. In all these circumstances, the chances for a market leak and a public story that Dollar Thrifty was not a valuable enough company to secure a deal with these two industry leaders would increase, an eventuality that could exert downward pressure on the company's stock price and create unrest among employees.

---

**193.** In *In re RJR Nabisco, Inc. S'holders Litig.* Chancellor Allen declined to enjoin a board from choosing a nominally lower bid from KKR over a bid from an MBO group, where the special committee had reasonably determined, in good faith, that the KKR bid provided more certainty of value (i.e., KKR's bid offered more permanent equity) and posed fewer risks (i.e., the MBO posed greater risks to the company's debt holders). 1989 WL 7036, at *12 (Del.Ch. Jan.31, 1989). In declining to accept plaintiffs' argument that the special committee, in deciding not to break the "tie" between the MBO group and KKR, breached its fiduciary duties, Chancellor Allen gave credence to the possibility that had the committee done so, and again asked the parties for an enhanced bid, KKR might have simply walked. *In re RJR Nabisco*, 1989 WL 7036, at *19. "[The special committee] concluded that in the circumstances (the stage of the auction, the level of the prices, the events of the day, etc.), the risks [of extending the auction and of requesting enhanced bids] outweighed the potential rewards [of deciding to approve one of two "equal" transactions]." *Id. See also Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53 (Del.1989) (upholding a board's decision to accept a slightly lower, but more certain, offer); *In re: Holly Farms S'holder Litig.*, 564 A.2d 342, 349 (Del. Ch.1989) (declining to issue a preliminary injunction where the "directors' action in accepting the significantly higher ConAgra offer before it could be withdrawn seems to have been 'reasonable in relation to the advantage sought to be achieved, or conversely, to the threat that a particular bid allegedly poses to stockholder interests.' ") (quoting *Macmillan*, 559 A.2d at 1288).

Although reasonable minds could have taken a different approach, the Board engaged in a reasoned consideration of the relevant factors and selected a reasonable course of action. It determined that the best interests of Dollar Thrifty's stockholders were served by not engaging in a wider sales effort in early 2010, continuing to concentrate on running the company as an independent concern, but also engaging in good faith and open manner with the sole party that had made a serious expression of interest. The Board also took into account the possibility that Avis or another acquirer might have a serious interest by making sure from the get-go that its negotiators structured any deal with Hertz to permit the emergence, consideration, and acceptance of a higher bid. By employing this more discreet approach, the Board also hoped to minimize the possibility of disrupting employee performance and of having the demonstrably undependable Hertz walk away.

This was a reasonable approach given the circumstances the Board faced.

b.  *The Board's Failure To Reach Out To Avis Before Finalizing A Deal With Hertz*

■ The plaintiffs, of course, say that the Board had another chance to address the Avis situation reasonably and again failed. This was when Avis made its strange overtures in mid April of 2010. As discussed earlier, on April 12, Avis's CEO Nelson called a JP Morgan banker, Sivitilli, who was not even working on the Dollar Thrifty engagement and asked him to act as eHarmony.com so that Nelson, confident that he would not be rejected, could call Thompson to set up a dinner. Although Nelson sent a public letter to Thompson and Capo after the Hertz Merger Agreement was announced stating the

purpose of the dinner was to "discuss a transaction," [194] the evidentiary record casts grave doubt on that assertion, at least to the extent that it implies that Nelson actually told Thompson or Sivitilli that was his purpose. That, after all, is the important point, not what was in Nelson's unexplained thoughts. Avis did not join in this litigation and its CEO Nelson did not file an affidavit. All the plaintiffs extracted was hearsay statements from an Avis 30(b)(6) witness without personal knowledge about what Nelson supposedly said. That witness was unwilling to say that Nelson had actually asked to talk about a possible transaction. Even when the Avis CEO had sufficient psychic reassurance that he would not suffer the emotional blow of Thompson not taking his call and actually dialed Thompson up, the Avis CEO did not say what he was about. That is, on this record, I can only conclude that Nelson never said to Thompson or Sivitilli that Avis was interested in making a bid for Dollar Thrifty.

Undoubtedly, there is evidence in the record that indicates that Thompson, Dollar Thrifty's financial advisors, and members of the Board suspected that one possible reason for the outreach was that Avis was interested in a deal. There was also a sense that Avis might have gotten wind of Hertz's interest. But there was also a plausible basis to believe that Nelson was interested in seeing if Thompson would come to work at Avis, which was experiencing management turnover.

The plaintiffs aggressively assert that Thompson lied in ultimately concluding that Nelson had contacted him for reasons other than to express an interest on the part of Avis in buying Dollar Thrifty. They also assert that the part of the S–4 that states Thompson believed the call was

194.  PX–53.

of a personal nature is false because Thompson had suspicions—albeit suspicions that he says he ultimately dismissed—that Nelson wanted to talk about a deal.[195]

I do not fault the plaintiffs for, early in pressing their case, latching on to this issue. That was their duty to their clients. But my job is to apply the measured skepticism of a reasoned mind to the record, and not the irrational speculation of a conspiracy theorist.

Indeed, a close review of the record suggests that there would have had to have been a conspiracy for this issue to have any real weight. Throughout the negotiation process, Thompson kept the independent directors, particularly Capo, the Board Chairman, informed through frequent e-mails and other communications. The Board was aware that Avis's CEO wanted to have dinner with Thompson. So were Dollar Thrifty's financial advisors.

When the process with Hertz had dragged on, the Board continued to consider whether to reach out to Avis and continued to believe that Avis's financial and antitrust constraints made it unlikely to make a firm and timely bid. The oblique, fumbling, and awkward nature of Avis's overtures late in the process with Hertz did not change the Board's mind. Given Avis's decision to walk away in 2008 when it could have bought Dollar Thrifty for a comparative song, the Board's skepticism over Avis's intentions is difficult to fault.

In determining not to go through with the dinner that had been scheduled for April 28 or to accelerate it to occur earlier, Thompson and the Board had no possible sinister motive. At that point in the process, Thompson would have personally liked nothing better than to receive a demonstrably superior proposal from Avis, have Avis bind itself to deliver the promised value, and for Thompson to be able to be rid of further dealings with Hertz CEO, Frissora, a person who Thompson found to be frustrating to deal with as a negotiator.[196] The Board was also suffering from Hertz fatigue and had no motive not to deal with Avis if it thought that would achieve a good outcome. So why not make sure the meeting was not about a transaction, take it just as a flyer?

Well, the reality is that the Board and Hertz were very far down the road toward a definitive merger agreement by the time Avis made its strange pass. The Board, as we shall see, believed that Hertz was in striking distance of offering a price that was at a very good level in comparison to

---

**195.** The S–4 filed by Hertz in connection with the Merger Agreement describes this issue thusly:

> On April 12, 2010, Mr. Nelson of Avis contacted J.P. Morgan to inquire about whether Mr. Thompson would accept a call from him. Mr. Nelson did not specify the reason he wanted to call Mr. Thompson. Following such contact from Mr. Nelson, J.P. Morgan conveyed Mr. Nelson's inquiry to Mr. Thompson and Mr. Capo. While he initially considered the possibility that Mr. Nelson requested the meeting for the purpose of discussing a potential bid for DTG, Mr. Thompson's understanding regarding Avis's interest and ability to effect such a transaction, the previously announced prospective changes in the senior management of Avis and the ambiguity surrounding the stated purpose of the meeting, as well as reports received by Mr. Thompson to the effect that Avis had made inquiries concerning his personal background, all led Mr. Thompson to conclude that the purpose of the meeting was of a personal nature, rather than to discuss a business combination transaction. DX–1 at 101.

This strikes me, overall, as a balanced treatment of the issue, and in particular, admits that Avis might have wanted to meet to discuss a transaction.

**196.** *See* PX–31 (Thompson) at 142–43.

the firm's fundamental value as measured by the Board and its financial advisors, with real assurances that Hertz would have a financial incentive to deal with antitrust risk and close, and with the potential to still receive a topping bid. Sure, Thompson could have decided to try to bump up his dinner date with Nelson (which was set up a mere six days *before* the signing of the agreement but was to take place three days *after* the Hertz deal was signed up on April 25) so that it occurred before the signing of the Hertz agreement. I suppose it is possible that Thompson could have pulled off a Johnny Cash and walked the line at the meeting without tipping off Nelson about the existence and status of the Hertz discussions. But that would still have been a very awkward conversation to have at a very delicate time. Moreover, to the extent that there was some real reason, as Thompson had, to conclude that Avis wanted to talk to Thompson about his own future, a dinner meeting could have put Thompson in the undesirably improper position of talking about his own future with an industry rival when he was on the verge of recommending that Dollar Thrifty sign up a merger agreement with another.

Given the extremely tepid nature of Avis's overture and given Avis's financial situation, the Board had reasonable grounds to believe that Avis was not in a position to immediately make any firm bid. In this respect, it is worth contrasting the overtures Hertz made to reopen talks in December 2009,[197] which were clear and serious, to the middle school roundabout approach of Avis in April. Avis, after all, is a competitor of Dollar Thrifty, not its pal. Although it may be unthinkable to diligent plaintiffs' lawyers focused on the hand they are dealt, the Board also had to take into account the possibility that Avis was just prospecting around to see if (as Avis might have gotten wind of) a deal with Hertz was in the works and to gum it up if it could. The world of commerce is a rough place, and it is sometimes the case that an industry buyer will not become a committed buyer until it realizes that the target will go to its rival if it does not act. If such a party can simply mess up the rival's deal, that might be enough.

For all these reasons, I am not persuaded that it was unreasonable for Thompson not to reach out to Avis based only on Nelson's flirtations and to focus on concluding discussions with Hertz. In so finding, I also note that *Revlon* is not a doctrine premised on a world of delicate would-be acquirers.[198] If Nelson of Avis

---

**197.** Frissora made a direct call to Thompson in early December and clearly stated he wanted to talk about a deal. He then followed up with a clear written expression of intent. DX–1 at 95; DX–18 (letter from Frissora to Thompson (Dec. 22, 2009)) ("As a follow up to that call, I am pleased to submit the following non-binding proposal for the acquisition of all the outstanding shares of Dollar Thrifty Automotive Group, Inc.").

**198.** *See Revlon*, 506 A.2d 173 (dealing with board resistance to a hostile bidder); *QVC*, 637 A.2d 34 (dealing with a board that discriminated against a committed interloper); *Macmillan*, 559 A.2d 1261 (dealing with a board that cut off an active auction and agreed to a restructuring); *In re Toys "R" Us S'holder Litig.*, 877 A.2d 975, 1006–07, 1009 (Del.Ch.2005) ("The plaintiffs, of course, argue that the Toys "R" Us board made a hurried decision to sell the whole Company, after feckless deliberations, rushing headlong into the arms of the KKR Group when a universe of worthier, but shy, suitors were waiting to be asked to the dance. The M & A market, as they view it, is comprised of buyers of exceedingly modest and retiring personality, too genteel to make even the politest of uninvited overtures: a cotillion of the reticent.... I begin by noting my disagreement with the plaintiffs about the nature of players in the American M & A markets. They are not like some of us were in high school. They have

had something real to say, he could have said it, and said it fast. A simple call to Thompson that said, we have to talk and if you aren't available, you will receive a letter by fax in the hour would no doubt have caused Thompson and the Dollar Thrifty Board to listen immediately. Nelson displayed none of the seriousness or urgency of his later May 3 letter in the period before the Hertz Merger Agreement was signed up. That just might not be coincidental.

### c. The Board's Decision To Enter Into The Merger Agreement With Hertz, And The Terms Of The Agreement

■ The final major decision that the plaintiffs challenge is the Board's determination to actually enter into the Merger Agreement with Hertz. According to the plaintiffs, that decision was unreasonable because the market price of Dollar Thrifty had been increasing, Hertz's own performance was lagging, and the premium to market that Dollar Thrifty would obtain was relatively modest in comparison to a broad sampling of deals compiled by the plaintiffs' expert, Professor Allen Ferrell of Harvard Law School. Even worse, although the Board was securing only a modest premium, the plaintiffs claim that the Merger Agreement contained onerous deal protections such as a termination fee of $44.6 million and a matching right provision that gave Hertz an unlimited, if extremely time constrained,[199] chance to match any series of topping bids. These deal protections quelled, in the plaintiffs'

original contention,[200] any chance for a real post-signing market check.

Again, I do not quibble with the notion that a properly motivated board might have told Hertz in April 2010 that unless it increased its bid to a, say 25%, premium over whatever the current market price of Dollar Thrifty was, Dollar Thrifty was going to walk away. In not quibbling with this scenario, I acknowledge that the Board believed that Dollar Thrifty had stabilized its performance and that it could do well in the relatively near future on its own. It may be that Hertz would have dug way deep to come up with even more and that this ploy would have worked.

But the question is not whether the Board could have reasonably decided to act differently than it did. The question is whether its decision to enter into the Merger Agreement when it did was reasonable. On this record, I am inclined to think it was.

In so finding, I believe several factors are relevant.

For starters, the plaintiffs ignore that April 2010 was not the beginning of a negotiation process, it was the end stage of a protracted negotiation with a buyer who had displayed a willingness to walk away in the past. When Hertz expressed interest in a transaction in December 2009, it named a price of $30, a premium of 11% over the then current market price of $26.97. Contrary to the plaintiffs' contentions, the record convinces me that at all times the Board was focused on getting Hertz to pay a very high price in terms of

no problem with rejection. The great take-over cases of the last quarter century—like *Unocal*, *QVC*, and—oh, yeah—*Revlon*—all involved bidders who were prepared, for financial advantage, to make hostile, unsolicited bids. Over the years, that willingness has not gone away.... Moreover ... capitalists are not typically timid, and any buyer who seriously wanted to buy the whole Company

could have sent a bear hug letter at any time, if it wanted to be genteel about expressing an interest.").

**199.** DX–56 § 5.03(d) (providing that Hertz has two business days in which to match a superior proposal).

**200.** Compl. ¶ 41, 53.

the Board's view of Dollar Thrifty's future earning potential and to ensure that any deal with Hertz had provisions giving Hertz a strong incentive to actually pay that price and allowing Dollar Thrifty to entertain higher bids from other parties. The plaintiffs' assertion that the Board was not looking for a market premium is based on, in my view, a misreading of the record.[201]

Throughout the process, Dollar Thrifty's negotiators consistently pressed for a higher price. By the end, they faced the happy problem that the market price of the company's stock had run up. Although Professor Ferrell examines the public information and concludes that there were no public leaks suggesting a deal was in the works that would explain the price increase, a skeptical mind might well conclude that after several months of discussions, some on Wall Street (or Co-lander Corridor) might have gotten a sniff. More importantly, the Board was actively considering the value of Dollar Thrifty in fundamental terms, as admonished to do so by cases like *Van Gorkom*.[202]

On April 8, Dollar Thrifty proposed a price of $44.96 per share that Hertz reacted to by immediately suspending due diligence and ceasing negotiations. By April 21, Dollar Thrifty had succeeded in moving Hertz up 33% from its original $30 offer to $40—a price that Elyse Douglas, Hertz's CFO, had proclaimed "ridiculous" less than a month earlier.[203] Hertz was resisting going any higher. At that time, the Board's advisors had performed DCF analyses showing top ranges of around $43 per share.[204] Notably, the plaintiff's own expert, whose views about company value have been presented to this court before,[205]

**201.** For instance, on December 31, 2009, when Dollar Thrifty's stock was trading at $26.44, Dollar Thrifty proposed a transaction price in the mid thirties per share. DX–21. Also, on April 8, 2010, when Dollar Thrifty's stock was trading at $36.21, Dollar Thrifty proposed a transaction price of $44.96 per share. DX–1.

**202.** *Van Gorkom*, 488 A.2d at 874–77.

**203.** PX–3 (March 30, 2010 email from Elyse Douglas to Hertz's bankers).

**204.** The plaintiffs point to an April 21, 2010 Goldman Sachs Research Report rating Dollar Thrifty as a "buy" and stating that the "takeout premium for Dollar Thrifty is 7% above our fundamental value of $47." PX–10. The plaintiffs' reliance on this document is misplaced. There is no evidence that Goldman Sachs's Chinese Wall was compromised. The analysts that produced the research report did not have access to the same internal, and presumably more relevant, Dollar Thrifty data as the bankers working on the Merger. The analysts also have an incentive to be more than rationally bullish. This tendency is born out by the data suggesting that "buy" recommendations are far more prevalent than "sell" recommendations. *See e.g.*, Brad M. Barber, Reuven Lehavy, Maureen McNichols & Brett Trueman, *Buys, Holds, and Sells: The Distribution of Investment Banks' Stock Ratings and the Implications for the Profitability of Analysts' Recommendations* (September 2005) *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=495882 (noting that although new stock exchange rules had the effect of decreasing "buy" recommendations from their 2000 high-water mark of 74%, as of June 2003 they still accounted for 42% of all recommendations compared to 17% for "sell" recommendations).

**205.** Travis Keath's views about company value have been presented to this court before. In the case of *In re Lear S'holder Litig.*, 926 A.2d 94 (Del.Ch.2007), Keath concluded that Lear's stock price's fair value was in the upper $30s to mid $40s. Based on that analysis, Keath opined that Carl Icahn's all-cash, all-shares offer of $36.00 per share was unfair. Although this court denied the plaintiffs' motion for a preliminary injunction, the stockholders largely agreed with Keath's assessment and declined to accept Icahn's 2007 enhanced bid of $37.25. They might regret the decision not to get out at the top, rather than the bottom. Lear's fortunes soon declined until its stock price dropped to $0.88

has conducted a DCF that comports with the advice given to the Board. The plaintiffs present the declaration of their expert, M. Travis Keath, valuing the company at this time between $44.25 and $57.93 per share.[206] Keath, however, arrives at this DCF valuation by including the synergies from the proposed merger.[207] That is, Keath did not present a sound DCF valuation. When the synergies are backed out, the plaintiffs admit that Keath's analysis is "not fundamentally different" than that of JP Morgan and Goldman Sachs.[208] In other words, Dollar Thrifty had pressed Hertz to pay something very near the high end of its own view of its stand-alone value, and a price that would involve synergy sharing if the mid-level of the DCF range was used.

In considering whether to lock in something like that value as a floor, the Board considered the possibility of holding out until Dollar Thrifty announced its first quarter earnings, on the hope that the market reaction would impel Hertz to stretch even more. Of course, by waiting, Dollar Thrifty risked having Hertz actually go through with its expressed intention to walk away if Dollar Thrifty waited until after the companies' respective earnings announcements to sign up a deal. Dollar Thrifty also risked a market yawn. Although its earning announcement was positive in the sense that its reported EBITDA would be greater than expected, the company's revenues were actually down.[209] Dollar Thrifty was capitalizing on its strategy of exposing its rental car fleet to the ups and downs of a now booming used-car market, but it was not making greater sales than estimated. The Board feared that it was reaching the top of its ability to wring profits from the used-car market, and that the company still lacked a long-run growth story, lacking the capacity to go international, and facing ongoing competition from larger industry players.[210]

Rather than play a further game of chicken, the Board decided to extract further concessions from Hertz as a condition to signing up a deal before the earnings announcements. Thus, Hertz moved its bid up to $41 from $40. Importantly, Hertz also offered up an additional $75 million of divestiture commitments to obtain antitrust approval.

Admittedly, this left Dollar Thrifty with a deal where stockholders would get a mere 5.5% premium over the current market price of $38.85 on the day before announcement. Of course, a 5.5% one day return is not a trifle when it allows the company to consider further bids and

by the end of June 2009. Lear eventually filed for bankruptcy on July 7, 2009.

206. PX–41 (Keath Declaration) at 14–15.

207. *Id.*

208. *In re Dollar Thrifty S'holder Litig.*, C.A. No. 5458–VCS at 167–68 (Del. Ch. Aug. 25, 2010) (TRANSCRIPT).

209. PX–31 (Thompson) at 51 ("On the EBITDA line there's no question that we were performing significantly above [Wall Street's] expectation, but actually on the revenue line we actually missed the revenue forecast in the first quarter.").

210. *See* PX–31 (Thompson) at 109–10 (admitting that Dollar Thrifty needs a new "growth leg," is currently looking for one, but has been unable to find one); *see also* PX–50 (Buster) at 197 (stating that Dollar Thrifty is not expanding its market share and that the rental car market is "fairly static."); *Id.* at 198–99 (discussing that there are three possible growth areas: on-airport markets, which are difficult to grow because the market is basically saturated; off-airport markets (the rental replacement business), which is dominated by Enterprise and which Dollar Thrifty had unsuccessfully tried to enter in the past; and international markets, which have major barriers to entry, especially for a small player like Dollar Thrifty).

when it sets a much firmer floor on the company's stock price.

The record persuades me that the Board's decision to sign up the Merger Agreement was a reasonable approach to value maximization given the circumstances. The Board had a firm handle on the company's prospects and had considered its fundamental value. The Board had bargained aggressively with Hertz throughout the process, having been willing to make discussions chillier and to even terminate them when necessary to extract concessions from Hertz. The Board also knew that Hertz had been willing to pull out of merger talks at much lower prices in the past.

The plaintiffs would have me fault the Board for not following blindly some crude rendition of the semi-strong form of the efficient capital markets hypothesis, one in which any board should treat the current market price as a reliable guidepost to decisionmaking. My understanding of ECMH is that it makes much less drastic claims.[211] The plaintiffs appear to embrace the view that the Dollar Thrifty Board would have done a great job if it could have sold Dollar Thrifty to Hertz in February 2009 for $3.50 per share, a 298% premium over market, rather than for $41 a share in April 2010. Of course, there are some more traditional and conservative views of good trading that involve the notion of selling an asset when it is fully valued—i.e., at or near the top of the market—rather than when it is beat up.[212]

The reality is that if the stock market is actually pricing Dollar Thrifty on its future expected cash flows, the market has had a

**211.** Michael L. Wachter, *Takeover Defenses When Financial Markets Are (Only) Relatively Efficient*, 161 U. PA. L.REV. 787, 792 (2003) ("Specifically, when financial markets are relatively efficient, while investors cannot expect to outperform the market on an ongoing basis, individual stock prices can still be incorrect at any point in time—either under- or overestimating the value of the corporation.") (citing JOHN Y. CAMPBELL, ANDREW W. LO AND A. CRAIG MACKINLAY, THE ECONOMETRICS OF FINANCIAL MARKETS 24–25 (Princeton Univ. Press, 1997)); Lynn A. Stout, *Inefficient Markets and the New Finance*, 7 (Univ. of Cal. Research Paper No. 05–11 2005), *available at* http://ssrn.com/abstract=729224 ("[I]n a world of disagreement we must question whether securities markets can be efficient in a fundamental value sense. As noted earlier, however, fundamental value efficiency is not the only possible understanding of efficiency. Many theorists who speak of 'efficient markets' seem to be relying on the alternate idea of informational efficiency—that prices respond so quickly to new information it is impossible for traders to make profits on the basis of the information. Indeed, it has become common for finance economists whose faith in fundamental value efficiency has been beaten out of them by market events and the accumulating evidence on anomalies to retreat to this intellectual position [Brealey & Meyers (200, p. 377); Malkiel (1999, p. 270–74)]. It is important to understand that when economists define market efficiency in terms of the difficulty of making arbitrage profits, they have abandoned the intoxicating and powerful claim that efficient markets produce accurate prices. A market can respond near-instantaneously to new information without producing prices that mirror fundamental value.") (brackets in original); RICHARD A. BREALEY & STEWART C. MEYERS, PRINCIPLES OF CORPORATE FINANCE 368 (Irwin/McGraw–Hill 9th ed. 2008) ("[M]ost of the tests of market efficiency are concerned with *relative* prices and focus on whether there are easy profits to be made. It is almost impossible to test whether stocks are *correctly valued*, because no one can measure true value with any precision.") (emphasis in original).

**212.** *See generally*, BENJAMIN GRAHAM, THE INTELLIGENT INVESTOR (Harper Collins 2005) (1949) (arguing that a prudent investor, in deciding how to proceed, should not be concerned with the erratic fluctuations in market price, but instead should be concerned with the fundamental or "central" value of the firm).

rather rapidly shifting sense of what those future cash flows are. With no fundamental changes in Dollar Thrifty's outlook, except for the possibility of an M & A deal, Dollar Thrifty's stock price rose from $26.97 in December 2009, to $38.85 in April 2010. The $41 represented a 52% premium to the December 22, 2009 price (the day that Hertz made its $30 offer) and a 4659% premium to the February 24, 2009 price (the day that Hertz made its final offer before that earlier round of negotiations broke down). More importantly, the Board was entitled, indeed arguably required by *Van Gorkom*, to consider the attractiveness of $41 per share in light of the company's fundamental value.[213] Reasonable minds can and do differ about how reliably stock prices predict the future performance of particular corporations.[214] But, our law does not require a well-motivated board to simply sell the company whenever a high market premium is available (such as selling at a distress sale) or to eschew selling when a sales price is attractive in the board's view, but the market premium is comparatively low, because the board believes the company is being valued quite fully.[215]

Here, the Board was entitled to use its reasonable judgment in determining

**213.** *Van Gorkom*, 488 A.2d at 881. *Cf.* Bernard Black and Reiner Kraakman, *Delaware's Takeover Law: The Uncertain Search For Hidden Value*, 96 NW. L.REV. 521, 552–54 (2002) (suggesting that it is more likely that firm managers can be trusted about the firm's value when they are contending that the company is not being materially undervalued by the market, than when managers say that the company is markedly undervalued by the stock market).

**214.** Query, was Dollar Thrifty really worth $1.67 per share on April 14, 2009; $16.00 per share on July 16, 2009; $23.27 per share on August 20, 2009; $30.06 per share on February 17, 2010; $42.32 per share on April 16, 2010, etc.? In one respect, it was in that these prices reflect what a small block of its shares could be bought at in the market. But did Dollar Thrifty really have such disparate earnings-generating potential on these dates to justify these wide disparities in stock prices, or were market players eyeing what others felt about Dollar Thrifty's short-term fate and making decisions on the greater fool theory? *See* William W. Bratton & Michael L. Wachter, *The Case Against Shareholder Empowerment*, 158 U. PA. L.REV. 653 (2010) (observing that the banks that were heavy participants in the subprime mortgage markets saw their stock prices soar due to market enthusiasm only to have them come crashing down when the market violently readjusted); *see also* Michael C. Jensen, *Agency Costs of Overvalued Equity* (Finance Working Paper No. 39/2004), *available at* http://ssrn.com/

abstract=480421 ("In part, the massive overvaluation of equity that occurred in the late 1990s and early 2000s was an understandable market mistake. Society often overvalues what is new—in this case, high-tech, telecommunications, and internet ventures. But that catastrophic overvaluation was also the result of misleading data from managers, large numbers of naïve investors, and breakdowns in the agency relationships within companies and within gatekeepers including investment and commercial banks, and audit and law firms (many of whom knowingly contributed to the misinformation and manipulation that fed the overvaluation). Under- or overvaluation of a firm can be due to market inefficiency, or it can occur in a market that is semistrong form efficient (when the market does not have the information available to managers). It does not matter for my analysis here whether markets are efficient or not. Moreover, there is a simple rule for managers to tell whether their stock price is overvalued: When managers perceive it is impossible for them to meet the performance requirements to justify the current price of their equity, the firm is overvalued.").

**215.** *Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *19 (Del.Ch. July 14, 1989) ("But just as the Constitution does not enshrine Mr. Herbert Spencer's social statics, neither does the common law of directors' duties elevate the theory of a single, efficient capital market to the dignity of a sacred text."), *aff'd, Paramount Commc'ns Inc. v. Time Inc.*, 571 A.2d 1140 (Del.1989).

whether it was a good time to sell and at what price. Of course, in signing up a deal without a pre-signing market check, it was incumbent upon the Board to consider whether it had extracted all the value it could and whether it was ensuring the viability of a post-signing market check. The plaintiffs fault the Dollar Thrifty Board on this count, asserting in their brief that the termination fee was a hefty 5.1% of the $1.172 billion value paid by Hertz and that it, along with the matching rights, would deter other bidders. Given the modest premium, why would a reasonable board accede to these terms?

The defendants answer in a convincing fashion. To begin, the defendants correct the plaintiffs' calculation of the termination fee. As the defendants point out, the plaintiffs ignore approximately 2.5 million share-equivalents in the form of options, restricted stock units and performance units in calculating the fee. In the Merger, these share-equivalents have to be paid for by Hertz or any other topping bidder. When this correction alone is made, the termination fee goes down to 4.3 %. Furthermore, the plaintiffs treat a $200 million special dividend that Dollar Thrifty will pay only if the Merger is consummated as not part of the transaction and as thus not part of the transaction value against which the termination fee percentage is calculated. Because the $200 million will be paid only in the event of the Merger, I am not convinced by the plaintiffs' position.

The preclusive aspect of any termination fee is properly measured by the effect it would have on the desire of any potential bidder to make a topping bid.[216] This observation is premised on the elementary notion that a termination fee is the amount a target company must pay to the "topped" bidder in the event that it decides to forgo the bird in hand in favor of the topping bidder's proposal, thereby effectively reducing the value of what the topping bidder is acquiring in any transaction with the target. Therefore, the $44.6 million termination fee, as set forth in the Merger Agreement, must be measured against the entire value of the Merger, which is logically quantified as the amount of consideration flowing into Dollar Thrifty shareholders' pockets—not by the amount of money coming exclusively from Hertz and Hertz alone. Also, because a termination fee's preclusive effect is best measured as the effect it has on a potential topping bidder's desire to make a move and enter the game, it is informative to look at how Avis—the would-be topping bidder—seemingly viewed the situation in the spring of 2010 when it made its bid of $46.50. When it made its July 28 bid of $46.50, Avis accepted that in order to top Hertz's bid, it needed to beat the price of $41.00 per share, a price that included the $200 million dividend. In fact, Avis's own bid itself calls for an identical special dividend of $200 million.[217] Put simply, the $200 million, regardless of the fact that it will be paid from Dollar Thrifty's own assets, must be matched in any topping bid. It is the *shareholders* who get the $200 million dividend in the transaction with Hertz, and even then *only if* the Merger is approved and is consummated. Put differently, a topping bidder *must* offer *value* to the target shareholders in excess of the value that is currently being offered by the Hertz Merger. Ignoring that reality—and insisting that merger consideration only counts if it comes di-

**216.** *In re Toys "R" Us, Inc. S'holder Litig.,* 877 A.2d 975, 1014–22 (Del.Ch.2005); *see also In re Lear Corp. S'holder Litig.,* 926 A.2d at 120.

**217.** DX–66.

rectly out of the pockets of the acquirer—is simply not in accord with reality. In examining the termination fee's preclusive effect, therefore, the $200 million, as part of the value produced by a consummation of the Hertz deal, must be counted, and the plaintiffs' argument to the contrary—while it serves their cause—is without merit. Thus, I conclude that the termination fee constitutes about 3.5% of the $1.275 billion deal value, and about 3.9% when the additional promise to pay up to $5 million in expenses is taken into account.

Although that is a relatively robust fee, it still constitutes only $49.6 million when combined with the expenses or about $1.60 per share and is therefore a relatively insubstantial barrier, as the Avis bid demonstrates, to any serious topping bid. In addressing the reasonableness of the fee, the plaintiffs also ignore that Dollar Thrifty attempted, but failed to get Hertz to accept a lower fee. The record shows efforts by Dollar Thrifty to get Hertz to agree to a higher reverse termination than Dollar Thrifty would offer as a standard termination fee. On March 17, Dollar Thrifty suggested that Hertz pay a 5% reverse termination fee and accept for itself only a 3% standard termination fee. Hertz refused and insisted that the standard and reverse termination fees be symmetrical. There is, of course, no necessary logical symmetry between these provisions.[218] But in the give and take of negotiation, bidders often demand such symmetry. As part of an overall package that included a price bump and a substantial increase in Hertz's obligation to divest assets if necessary to secure antitrust approval, Dollar Thrifty accepted the 3.9% termination fee. That is, by contrast to the plaintiffs' arguments, the Board did bargain for value in negotiating the deal protections and only acceded to the termination fee when it reached terms regarding price and deal certainty that it viewed as attractive.

The record also reveals that the Board considered whether the deal protections in the Merger Agreement would deter a serious topping bidder from emerging. The Board believed that the relatively lenient no-shop provision would make it possible for any serious interloper to obtain confidential information, make a superior proposal, and have that proposal fairly considered by the Board. The relatively lengthy time between the signing of the Hertz Merger Agreement and the stockholder vote, and the relatively distant Merger Agreement termination date of April 2011 also increased the time available to a late coming bidder to formulate and present a topping bid. The Board's belief that the Merger Agreement gave adequate room to Avis and others to make a topping offer has turned out to be true. Avis has had access to confidential information since May 4, 2010—the very day after Nelson sent his letter—and Avis was able to present a proposal to the Dollar Thrifty Board for consideration on July 28, having had three months to amend covenants with its lenders and secure financing.

The Board also believed that a per share termination fee of $1.60 and matching rights would not deter a bidder interested in making a materially higher bid from emerging. That has also turned out to be true, as Avis made a proposal to acquire Hertz for $46.50 a share, a bid that was not conditioned on invalidation of the termination fee. Even if $1.60 per share was deducted from the nominal Avis bid, that bid would be higher than the consideration

---

218. *E.g.*, Steven M. Davidoff, *The Failure of Private Equity*, 82 S. Cal. L.Rev. 481, 515–16 (2009).

Hertz will pay if the Merger is consummated.

In fact, there is reason to believe that Avis was impelled by the Merger Agreement to act precisely because it knew that unless it did, Dollar Thrifty would likely be sold to Hertz.[219] Avis did not even own a share of stock in Dollar Thrifty until after the Merger Agreement was signed.[220] Although Avis proclaimed loudly its supposed prior interest in doing a deal, Avis did not secure amendments to its credits agreements from its lenders until July 21, some three months after the Merger Agreement was announced. And, as shall be discussed, Avis still refuses to offer to pay any reverse termination fee if it fails to secure antitrust approval. In view of Avis's meandering history of interest in Dollar Thrifty, the inference arises that the Board's decision to secure a valuable deal and to conduct a passive, post-signing check was a reasonable, indeed perhaps the most savvy, way to induce Avis to decide whether it wanted to make a real deal for Dollar Thrifty. Whether it should be so or not, human beings often value things—even other human beings like romantic partners—more when others might claim them.

On this record, I simply cannot conclude that the Board's approach to maximizing

sale value was unreasonable. Certainly, I cannot call the deal protections preclusive, in that they left any serious bidder with the chance to buy the company while bearing the cost of modest compensation to Dollar Thrifty's jilted first partner.

As important, the deal protections are not in any way coercive. The plaintiffs claim that there is no reason why Dollar Thrifty stockholders would want the deal with Hertz. That may be true if Avis is actually willing to pay more. What the Board did in the Merger Agreement was to give the stockholders the chance to accept a deal with Hertz or the chance to turn it down. While Hertz was bound, that would place a floor, but not a ceiling on Dollar Thrifty's stock price.[221] If no other bidder emerged, the stockholders could make a determination for themselves whether it was, as the Board believed, a good time to sell or whether it was better to bet on Dollar Thrifty's independent prospects. That determination would not be hampered by the termination fee, because the fee would not be paid to Hertz unless there was both a no vote and the acceptance of another more valuable transaction contract within a year.[222]

At this stage, I actually confess to confusion about what the plaintiffs' objective is.

**219.** In the well known case of *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003) the target, NCS, was insolvent. For a long period of time, an industry rival, Omnicare, had a chance to make an acquisition offer for NCS. Omnicare was never willing to make an offer that paid off all of NCS's debt, much less pay anything for the equity. Indeed, it wanted to pick up NCS in a bankruptcy sale. Only after another industry rival, Genesis, agreed in a binding merger agreement to pay off all of NCS's debt and pay $1 per share for the equity did Omnicare express an interest in making a bid that would pay off all the debt and provide a payment to the equity holders, and only made a genuine, unconditional offer several months after the NCS/Genesis merger was executed. Indeed,

as here, Omnicare did not buy stock in NCS until after the merger with Genesis was announced. *Omnicare, Inc. v. NCS, Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del.Ch.2002).

**220.** PX–37 (Tucker) at 61.

**221.** *See In re IBP S'holder Litig.*, 789 A.2d 14 (Del.Ch.2001) (target board successfully used the signing of a management buyout to set an above market floor on company stock price and induce strategic bidders to compete to top).

**222.** DX–56 (Merger Agreement) § 8.02(a)(i)-(iv), (b).

The deal protections about which the plaintiffs obsess are clearly not the barrier to a deal with Avis.

As things now stand, what is standing between the stockholders and a deal with Avis is the Board's determination that it will not consider Avis to have made a superior proposal unless it provides a greater promise of closing certainty.[223] I admit to being puzzled that this problem has not been solved if Avis is serious. Avis could reduce its nominal bid of $46.50 per share by $1.60, up its willingness to divest to the same level as Hertz, and offer to pay a reverse termination fee equal to Hertz, and still have a topping bid. One senses that the Board knows how obvious this move is and wonders why Avis, if it is serious, has not made it.

The plaintiffs, however, do not dilate on this point and seem to be totally oblivious to the economic reality that value will not be value unless it is ultimately paid. The stockholders of Honeywell enjoyed the psychic satisfaction of having a more lucrative bid by GE accepted by a well-motivated board, forgoing an alternative available transaction with another industry player, and never receiving the consideration offered by GE when antitrust approval was not received.[224] The stockholders of several corporations in recent years have enjoyed similar psychic, but not financial rewards, as premium-generating deals were papered and not consummated.[225] In the wake of such failed deals, the formerly desired targets have often suffered, both in terms of operating performance and market valuation. To pretend that contractual provisions designed to ensure that the buyer actually pays have no relation to the value of the deal ignores economic reality and common sense. To pretend that there are not dangers in holding out for an even bigger blow out price when the market is fully valuing a target is equally obtuse.[226]

### 6. Plaintiffs Have Not Demonstrated A Likelihood Of Success On The Merits

For all these reasons, I find that the plaintiffs have not demonstrated a reason-

---

**223.** DX–9 (August 3, 2010 Letter from Thompson to Nelson) (conveying that Avis's offer is more favorable financially and is supported by financing that is likely to be obtained, but that it cannot be declared a "superior proposal" because of Avis's failure to give adequate assurances that it would secure regulatory approval and close the deal).

**224.** See generally George Stephanov Georgiev, Bridging the Divide? The European Court of First Instance Judgment in GE/Honeywell, 31 Y.J. INT'L L. 518 (2006).

**225.** See e.g., Hexion Specialty Chemicals, Inc. v. Huntsman Corp., 965 A.2d 715 (Del.Ch. 2008); United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810 (Del.Ch.2007); Steven M. Davidoff, The Failure of Private Equity, 82 S. CAL. L.REV. 481 (2009) (chronicling incidents of mergers that fell apart at target companies such as Sallie Mae (SLM Corp.), BCE, Inc., 3Com Corp., and Alliance Data Systems, Inc.).

**226.** Consideration of the respective fate of the stockholders of Lear Corporation and Inter–Tel, Inc. in 2007, illustrates the point. In Lear, the stockholders turned down an enhanced 2007 offer of $37.25 per share by Carl Icahn, believing that he could, and should, pay more in a very hot market. He would not. The company filed for bankruptcy in July 2009. In re Lear Corp. S'holder Litig., 967 A.2d 640 (Del.Ch.2008). By contrast, in Mercier v. Inter–Tel (Delaware) Inc., the stockholders were given further time to consider whether to take a $25.60 per share offer when the board believed that the market was turning. Mercier v. Inter–Tel (Delaware) Inc., 2007 WL 3325955, at *29 (Del. Ch. Aug. 14, 2007). After considering additional evidence, including a decline in the financing markets, the Inter–Tel stockholders accepted the deal, which was one of the last premium-generating transactions of 2007.

able probability of success on the merits of their *Revlon* claim. At bottom, the record depicts a well-motivated and diligent board that responded with openness, rather than resistance, to an expression of interest by a party that had twice before failed to consummate a merger. It had reason to be dubious about Hertz, but it was willing to take a chance, so long as it did not disrupt the company's operations. Rather than rolling over for Hertz, the Board bargained hard, shut down the process a few times, and moved Hertz up from its initial expression of interest at $30 to $41 per share. The Board also extracted real closing certainty, through antitrust divestiture provisions and a reverse termination fee, while leaving room for a likely player like Avis to actually realize that if it didn't move this time, it would never be able to again. By doing what it did, the Board set a floor under the market price of Dollar Thrifty stock, at a level that was very high in comparison to the averages over the prior year and very high in relation to the company's DCF value, left its stockholders with the choice of turning down the deal at relatively low cost, and the chance to reap more from a bidder like Avis who might top.

Although other reasonable approaches might have existed, including one that involved contacting Avis pre-signing and trying to stimulate a pre-signing auction, the question is whether the approach the Board took was unreasonable. On this record, the Board has demonstrated that its approach was a reasonable one, that was the product of considerable deliberation.

Indeed, although I tend toward the *Fort Howard* view of directors' ability to predict the future [227] as compared to the *Omnicare* omniscience view,[228] the objective evidence seems to indicate that the Board's strategy worked and made Avis step forward. In that regard, Avis's seriousness about making a viable bid any earlier has to be discounted by its lack of owning one share, its failure to make anything other than a tepid dinner invitation, and the fact that it took it three months to actually get lender approval to make a bid.

### C. The Risks Of An Injunction Outweigh The Benefits To The Shareholders

Finally, on this record, it would be difficult to justify the entry of an injunction even if the plaintiffs' have satisfied, as they must, their merits burden. From all appearances, the risks of an injunction seem to be greater than the benefit, when judged from the standpoint of the Dollar Thrifty stockholders. Although an injunction would not release Hertz at this point,[229] it would introduce a period of

---

227. *In re Fort Howard Corp. S'holder Litig.,* 1988 WL 83147, at *14 (Del.Ch. Aug. 8, 1988) ("*Revlon* explicitly recognized that a disinterested board may enter into lock-up agreements [and by implication other deal protection devices] if the effect was to promote, not to impede, shareholder interests. (That can only mean if the *intended* effect is such, for the validity of the agreement itself cannot be made to turn upon how accurately the board did foresee the future).") (emphasis in original).

228. *Omnicare,* 818 A.2d at 933 ("The latitude a board will have in either maintaining or using the defensive devices it has adopted to protect the merger it approved will vary according to the degree of benefit or detriment to the stockholders' interests that is presented by the value or terms of the subsequent competing transaction.").

229. DX–56 (Merger Agreement) § 7.01(f) (requiring that a party to the Merger Agreement use its reasonable best efforts to get any injunction lifted before being relieved of its obligations under the agreement); *In re Dollar Thrifty S'holder Litig.,* C.A. No. 5458–VCS at 92–94 (Del. Ch. Aug. 25, 2010) (TRANSCRIPT) at 139. The drop dead date of the

uncertainty and delay. Rather than exerting leverage on Avis to actually reach terms with the Board on a better deal, it would leave Dollar Thrifty in a period of limbo in which both Hertz and Avis would have the chance to dicker, while Dollar Thrifty's employees find it hard to concentrate on the job at hand, wondering what the fate of their employer and their jobs will be. On this record, the only thing preventing Avis from being deemed the superior bidder is its failure to offer any form of reverse termination fee whatsoever. The termination fee and matching rights the plaintiffs obsess over are not inhibiting competition, and I am not persuaded that the uncertain effect of a preliminary injunction would produce any benefit to the Dollar Thrifty stockholders, whereas I do fear that an injunction would pose genuine risk to them. If Dollar Thrifty terminates the Merger Agreement to sign up with Avis, it will have to pay Hertz $44.6 million plus up to $5 million in expenses. If Avis does not close because it does not attain antitrust approval, Dollar Thrifty would be out upwards of $44.6 million, receive no compensation from Avis under its proposal, have lost the Hertz deal, suffered the productivity-reducing effects on its work force of a lengthy sales process, and come out at the end with no deal. That scenario poses real risks to Dollar Thrifty's stockholders that the Board is entitled to consider. In other words, the balance of harms tilts against an injunction, especially because the Dollar Thrifty stockholders are free to turn down the Hertz deal for themselves if they are confident that either the company will thrive on its own or that Avis will actually come through with a higher binding deal,

secure antitrust approval, and pay the promised consideration.

In recent days, Avis issued a press release indicating its willingness to increase its offer if the Dollar Thrifty stockholders turn down the Hertz deal, but still refusing to offer up any reverse termination fee.[230] The plaintiffs sent this to me for consideration. The press release confirms, rather than undercuts, my belief that an injunction would be imprudent. Rather than justify its refusal to offer a reverse termination fee on economic grounds, Avis says it would be unfair for it to have to offer up a reverse termination fee when it is willing to do a deal in which it gets no termination fee if Dollar Thrifty signs with it and then does another deal with someone else at a higher price. More like a child arguing with a parent about the comparative treatment of his sibling than a determined buyer, Avis says that "fairness" demands that it be treated equally with Hertz.[231] Economic seriousness might suggest a focus on addressing the Dollar Thrifty Board's apparently legitimate concern about closing certainty and not ignoring the reality that Hertz expended resources in the merger negotiation process and bound itself firmly and publicly to a deal several months before Avis even made a financed bid, taking business risks Avis had the chance in prior years to take and never would. Notably, Avis has chosen not to litigate for itself and to subject itself to discovery.

This sort of negotiating dynamic—which is what the Avis letter is—is one best not intruded upon by a judge, when an independent board and the Dollar Thrifty

Merger Agreement is not until April 26, 2011. DX–56 § 8.01; *In re Dollar Thrifty S'holder Litig.*, C.A. No. 5458–VCS at 92–94 (Del. Ch. Aug. 25, 2010) (TRANSCRIPT) at 153.

**230.** Press Release, Avis Budget Increases Premium Offer for Dollar Thrifty and Sets the Record Straight on Antitrust (Sept. 2, 2010).

**231.** *Id.*

stockholder base are well positioned to address Avis's overtures for themselves. In so stating, it is notable that the current dynamic is obviously exerting pressure on Avis to increase its bid and, at some point, one would think that economics, rather than concerns about symmetrical treatment with Dollar Thrifty's first merger partner, would impel Avis, if it is serious, to address the Board's demand for a reverse termination fee. Avis is, of course, the master of its own bid, though, and the plaintiffs have presented no rational basis for me to conclude that it is unreasonable for the Board to demand a reverse termination fee from Avis.

## IV. *Conclusion*

For all these reasons, the plaintiffs' motion for a preliminary injunction is denied. IT IS SO ORDERED.